## ADOPTION OF STUART & others.[1]

No. 95-P-14.

Essex. June 22, 1995. - November 6, 1995.

Present: WARNER, C.J., PERRETTA, & LENK, JJ.

*Adoption*, Dispensing with parent's consent. *Parent and Child*, Dispensing with parent's consent to adoption. *Evidence*, Child custody proceeding.

Discussion of the standard of appellate review of a decision of a Probate Court judge in a proceeding to dispense with parental consent to adoption pursuant to G. L. c. 210, § 3. [381-382]

In a proceeding to dispense with parental consent to the adoption of three minors pursuant to G. L. c. 210, § 3, the judge's subsidiary findings of fact were not supported by clear and convincing evidence and did not support the judge's conclusion that the mother was not a fit parent at the time of trial. [387-392]

The record of a proceeding under G. L. c. 210, § 3, to dispense with parental consent to adoption did not disclose that an adoption plan for the three minors had been either presented to or considered by the judge and dispensing with parental consent to adoption in the absence of such a plan was error: the matters were remanded for further proceedings as appropriate to the circumstances. [392-395]

PETITIONS filed in the Essex Division of the Probate and Family Court Department on June 20, 1991.

The cases were heard by *Mary McCauley Manzi*, J.

*Elizabeth B. Dunn* for the mother.

*Elizabeth A. Keliher*, Assistant Attorney General, for Department of Social Services.

*Joseph K. Del Valle* for the minors.

LENK, J. Megan Kramer, joined by her three minor children,[2] appeals from the 1994 allowance by a Probate and

---

[1]His sisters, whom we call Megan Ruth and Carrie. All of the names used in this opinion are pseudonyms.

[2]Although the children did not file a notice of appeal from the decree, the arguments raised in their brief are consistent with those of their mother. See also note 17, *infra*.

Family Court judge of petitions filed in 1991 by the Department of Social Services (DSS) pursuant to G. L. c. 210, § 3, to dispense with her consent to the adoption of Stuart, Megan Ruth, and Carrie Kramer. The Kramers argue on appeal that (a) the judge's subsidiary findings of fact do not support her ultimate finding of current parental unfitness, and (b) the judge erred by not requiring DSS to present fully developed adoption plans and by terminating the mother's parental rights in the absence of any adoption plans. The minor Kramers also contend that DSS has failed to provide adequate services for the reunification of the family. Because we agree that the judge's subsidiary findings do not warrant a determination of current parental unfitness sufficient to compel dispensing with the mother's consent to adoption and, further, because we conclude that there was noncompliance with the statutory mandate that the department's adoption plan be considered by the court, we vacate the decrees allowing the petitions and reverse the judgments.

1. *Current parental fitness.* The principles of law that we apply in reviewing the judge's decision are well settled. Before the trial court may take what has been characterized as the "extreme step" of irrevocably terminating the parent and child's legal relationship pursuant to G. L. c. 210, § 3, the petitioner, here DSS, must prove by clear and convincing evidence that a parent is currently unfit to further the child's best interest. *Adoption of Carlos*, 413 Mass. 339, 348-350 (1992). *Adoption of Harriet*, 29 Mass. App. Ct. 111, 113-114 (1990).

"[C]areful factual inspection and specific and detailed findings" by the trial court are "mandated in cases of this nature." *Adoption of Harriet*, 29 Mass. App. Ct. at 112, and cases cited. The judge's findings are required to be "specific and detailed so as to demonstrate that close attention has been given the evidence," *Custody of Eleanor*, 414 Mass. 795, 799 (1993), thereby showing that the trial court's decision was based on a consideration of all relevant facts. *Adoption of a Minor (No. 2)*, 367 Mass. 684, 688-689 (1975). Judges are to use "utmost care" in these proceed-

ings, *Custody of a Minor (No. 2)*, 392 Mass. 719, 725 (1984), and the trial court's findings must "make clear" that the judge gave "careful consideration" to pertinent statutory criteria in reaching her decision. *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 6 Mass. App. Ct. 477, 478-479 (1978). The judge's findings, inferences, and rationale are thus to be clearly set forth and are to explain the conclusions reached. A determination of current parental unfitness can only result if the judge's findings prove it "clearly and convincingly." *Custody of Eleanor*, 414 Mass. at 799.

The judge's findings themselves will not be disturbed unless shown to be clearly erroneous, and deference is to be accorded the trial judge's assessment of the credibility of witnesses and the weight of the evidence. *Id.* at 799, and cases cited. However, "[d]iscretion in this context does not of course mean arbitrary or capricious decision; it calls for decision based on *all* of the relevant facts. Troublesome facts . . . are to be faced rather than ignored. . . . Only then is the judge's conclusion entitled to the great respect traditionally given to discretionary decisions." (Emphasis original.) *Adoption of a Minor (No. 2)*, 367 Mass. at 688-689. Moreover, even if each of the judge's findings is not clearly erroneous, it "does not follow . . . that the findings, taken together, proved parental unfitness by clear and convincing evidence." *Custody of Eleanor*, 414 Mass. at 800.

The Probate and Family Court judge, after three days of trial in October, 1993, at which eight witnesses[3] testified and eight exhibits[4] with multiple sub-parts were received in evidence, issued her Amended Findings of Fact and Conclusions of Law on January 11, 1994.[5] The court concluded that DSS

---

[3] The children did not testify; the children's therapists, ongoing and adoption social workers, and mother did, as did the guardian ad litem.

[4] The exhibits consisted of three G. L. c. 119, § 51A, reports and one supporting affidavit, seven DSS service plans, eleven DSS reports to the Lynn District Court in connection with G. L. c. 119, § 24, proceedings, the mother's criminal record, and the guardian ad litem's report.

[5] Original findings were dated December 22, 1993, and amended findings were dated "January 11, 1994, as of December 22, 1993."

had proven by clear and convincing evidence that the mother "currently lacks the ability, capacity, fitness and readiness to assume parental responsibility for the minor children . . . and that the best interests of the said children will be served by a decree dispensing with the need for parental consent to their adoption."

In reaching these conclusions, the court made sixty-four findings of fact, roughly half of which recite from documents in evidence or concern often undisputed background information about the family.[6] The remaining subsidiary findings of fact are sparse, too often conclusory, and lack the requisite specificity and detail so critical in cases of this nature. The subsidiary findings provide little insight into what facts the judge did and did not consider and rely upon, what inferences the judge drew, and, in short, why the judge reached the conclusion of *current* parental unfitness. The judge's findings accordingly do not satisfactorily "demonstrate that close attention has been given the evidence." *Custody of Eleanor*, 414 Mass. at 799. Moreover, her ultimate determination of current parental unfitness does not clearly and convincingly follow from the cursory findings made, even when seen as not clearly erroneous and taken together as a whole.

a. *Background facts.*[7] Megan Kramer, born November 8, 1960, is the biological mother of Stuart, born May 23, 1982, Megan Ruth, born July 14, 1984, and Carrie, born October 17, 1986. Megan is married to Henry Kramer, the children's biological father who left and has been living apart from his family since prior to 1989; he raised no objection to and took

---

[6]On occasion, the judge reported such information inaccurately. In one finding, for example, she incorrectly states that Megan's incarceration began in January, 1992, rather than January, 1991. Since the judge also found that Megan continued to live with the alleged abuser after the allegations of abuse surfaced and until her incarceration began, it is unclear whether the incorrect later date was of significance in the judge's determination of Megan's unfitness. Also, the court's findings often recite the contents of various G. L. c. 119, § 51A, reports and DSS reports to the Lynn District Court. The court thereby appears to rely upon and accept as true those portions of the reports referenced. See note 15, *infra*.

[7]The background facts are taken from the Probate Court judge's findings as well as from uncontested record evidence.

no part in this G. L. c. 210, § 3, proceeding. Living on Aid to Families with Dependent Children (AFDC) payments and having been evicted from their home in Revere after Henry's departure, Megan and her children moved into the home of Megan and Henry's mutual friend, Daniel Parrish, who offered the family inexpensive, if crowded, housing.

The Kramer family was unknown to DSS until October, 1989, when DSS received reports of suspected child abuse filed pursuant to G. L. c. 119, § 51A. The reports alleged that Megan and Parrish neglected the children by providing unsanitary living conditions and inappropriate dress and by virtue of Megan Ruth's one week absence from school. The reports were subsequently found supported by DSS against the mother on the grounds of neglect. The reports also alleged that Parrish had sexually abused Carrie with the mother's at least tacit awareness; the § 51A reports were not at the time supported in this regard.

As a result of these reports and its investigation of them, on October 26, 1989, DSS filed petitions with the Lynn District Court pursuant to G. L. c. 119, § 24, for each of the children, and DSS was granted temporary custody. Shortly after the children were removed, DSS received another § 51A report on November 6, 1989, alleging again that Carrie had been sexually abused by Parrish. Since the day the children were removed to foster care, they have not lived with their mother. Permanent custody of the children was granted DSS in August, 1991; this occurred while the mother was in prison.

Within months of the removal of her children in October, 1989, Megan Kramer was arrested, on December 27, 1989, for conspiracy to violate the controlled substance act and for trafficking in cocaine. Megan pleaded guilty and began serving her five-year sentence on January 23, 1991; she was released from prison in July, 1993, three months before trial of these G. L. c. 210, § 3, petitions began. Shortly after the children were removed from Megan's care in October, 1989, Parrish went to prison for sexually abusing Megan's niece. Megan at the time did not believe Parrish had abused her

niece or any of her own children. Megan visited Parrish from time to time in prison. Parrish returned to his home in October, 1990, and he and Megan resided at the house for three months before Megan left for prison in January, 1991. Megan's last contact with Parrish was in December, 1991; Megan does not wish to resume this relationship. Following her July, 1993, release from prison and at the time of trial, Megan was living with relatives in her brother's Somerville house, and she had found employment. Any previous drug or alcohol abuse by Megan had apparently ceased for several years by the time of trial.

After being removed from their mother's care, the three children were initially placed together in what proved to be an unfortunate foster care situation.[8] The children were removed from that home on January 18, 1990, and Megan Ruth and Carrie were then placed together in a second foster home, not a preadoptive one, where they remained through the time of trial. Stuart was also placed in a second foster home, separate from his sisters, where he remained until being hospitalized for two weeks in mid-1991 due to concerns about major depression and sexually acting-out behavior and an incident involving oral sex with Carrie. He was removed to a third foster home and was hospitalized again in December, 1992, placed at the Judge Baker Children's Center, then transferred to the St. Vincent's Diagnostic Program in Fall River, where he remained through the trial. All the children have been in therapy and each of their therapists testified that she "believed" the child had been sexually abused by Parrish. Stuart's therapist also "believes" that he had been sexually touched by Megan. Stuart has some speech and hearing problems, some learning disabilities and developmental delays, and emotional difficulties, although he was reported to be doing better at the time of trial and beginning to be able to work on sexual abuse issues. Megan Ruth is not

---

[8]Spanish and not English was the primary language; the foster parent and the children practiced different religions; the children were disciplined by being confined in a closet-like room; and at least one was allowed to go to school without underwear.

considered to have special needs, has made good progress in therapy, and is a warm and sensitive child. Carrie had, at the time of trial, made progress in therapy insofar as bedwetting, nightmares, and sleeping difficulties had abated; she was having some academic difficulties but is not considered to have special needs. The children all need continued therapy.

After her children were removed in October, 1989, and until she was incarcerated in January, 1991, Megan Kramer had weekly visits with her children. The visits became monthly in the first year of incarceration, then every other month until April, 1992, when they, and all telephone contacts, ceased. The visits were initially suspended because DSS wanted a "neutral" evaluation of the children to be conducted requiring the temporary suspension of visits with their mother, to which the mother acquiesced. The visits were suspended by the Lynn District Court in September, 1992, following the evaluations. Until the visits were suspended, they had generally gone well, although apparently causing the children some emotional turmoil. The mother had also corresponded with and sent gifts to the children. The mother has been unable to see, speak with, or correspond with her children since April, 1992, although both mother and children wish the visits to resume, and the children have indicated their desire to be returned to their mother. In this latter period when no visitation has been allowed, the mother has also not been permitted meaningful contact with the children's therapists. The therapists do not recommend visitation or reunification.

In September, 1992, another § 51A report was filed, alleging that during a sexual abuse evaluation, Stuart disclosed that his mother had fondled his penis,[9] that Parrish had sex-

---

[9]Stuart's therapist testified that, during a 1992 sexual abuse or "SITT" evaluation which she did not conduct but at which she was present, Stuart stated that his mother "fondled his penis. Of course, he didn't use penis but he did say, she rubbed him down there." That was the sole allegation of sexual abuse made by Stuart against Megan and was admitted in evidence at trial only for Stuart's state of mind. The individual who conducted the evaluation did not testify; the evaluation report was not in evidence, and there was no evidence as to what protocol was used during the

ually abused him and that he and his sisters had been forced to watch pornographic movies. On October 5, 1992, a § 51A report was found supported by DSS due to the alleged sexual abuse of Stuart by his mother and the alleged sexual abuse of Stuart and Megan Ruth by Parrish. Based on these allegations, Megan was arraigned, while in prison on the drug offenses, on two counts of indecent assault and battery on a child under fourteen and one count of disseminating harmful material to a minor. The charges were pending at the time of trial on the c. 210, § 3, petitions. While in prison on the drug offenses, Megan completed three eight-week parenting courses and took psychology and child development classes for academic credit. She also underwent drug screenings, attended individual therapy, and went to Alcoholics Anonymous and Narcotics Anonymous meetings while incarcerated. After her release from prison, Megan was essentially in compliance with the DSS service plan, limited only by transportation costs, insurance coverage, and work schedules.

b. *Discussion.* It is unchallenged that when the children were removed from her care, Megan Kramer was not a fit mother. The question before the judge in October, 1993, however, was whether Megan Kramer was *at that time,* and not in 1989, a fit mother. It was DSS's burden to prove by clear and convincing evidence that she was not. The evidence, however, did not rise to this level, and the judge's findings did not reflect sufficient consideration of the mother's current parental fitness.

The judge's findings on the subject of the mother's fitness suggest that the court's focus was on the past and not the present. The court looked to: inappropriate comments made by Megan to her children in 1989 as to why she had sold

---

evaluation or what questions were asked of Stuart. There was no evidence as to when the alleged sexual touching occurred. Stuart's disclosure was the basis of the 1992 § 51A report and subsequent criminal charges brought against Megan. The mother has never acknowledged such sexual touching and testified at trial that it did not occur. She refused, on the advice of counsel, to participate in a sexual offender's evaluation. Megan testified that she had touched Stuart in the genital area in caring for him following testicular surgery and in order to apply medication for a rash.

drugs[10];   the contact Megan had had with Parrish in 1990
before she went to prison; and the "new" criminal charges
brought in 1992 against Megan while in prison, which were
pending at the time of this trial and which arose out of
Stuart's 1992 sexual abuse evaluation.

The judge's findings regarding Megan's fitness to parent
also reflect the court's view that Megan's past responses to
the allegations of sexual abuse were improper. The judge
found that: Megan had waited until trial[11] to acknowledge
Parrish's sexual abuse of her children; that she was contra-
dictory[12] at the time of trial as to whether she believed
Parrish had sexually abused her niece; and that even having
belatedly acknowledged Parrish's sexual abuse of her chil-
dren as a result of her therapy while in prison, she accepted
no responsibility for the assaults. The court found "no" evi-
dence that Megan had gained understanding of these past
events and found that Megan "has been unable and or un-
willing to protect the children from sexual abuse."[13] The

---

[10]The mother explained her sale of drugs to the children by telling them
that she did it to be able to buy them things for Christmas, get them a
better place to live, and get the family back on its feet.

[11]It is undisputed that, prior to receiving therapy while in prison, Megan
did not acknowledge that Parrish could have sexually abused her children
and her niece. The judge's finding that Megan failed until trial to acknowl-
edge the sexual abuse of her children, however, does not take into account
evidence that Megan had acknowledged to the guardian ad litem prior to
trial that Parrish could have abused her children.

[12]The trial judge found Megan's testimony contradictory because, al-
though Megan acknowledged at trial that Parrish could have abused her
niece and that he had pleaded guilty and gone to jail for doing so, Megan
also testified that her sister (her niece's mother) filed the sexual abuse alle-
gations because Megan had previously refused to allow her sister, who was
unable to bear more children, to become Carrie's guardian. Megan also
testified that the niece had told Megan that the abuse did not occur.

[13]It is unclear on what basis the trial court determined that Megan had
accepted no responsibility for the assaults and that no evidence existed to
show that Megan had gained understanding of past events. The former
subject does not appear to have been raised in testimony. As to the latter,
the mother testified that she knew that any reunification would be a
lengthy and time consuming process, that therapy for herself and the chil-
dren would be necessary for quite some time, that "my kids have psycho-
logical problems and I know they have sexual abuse issues to be brought
up."

judge also noted that Megan "has continued to deny that she engaged in any sexual touching of" Stuart and has refused DSS's request that she participate in a sexual offender's evaluation. See note 9, *supra*.

It is equally significant to note in this regard what the judge did *not* find. The court made no finding that any sexual abuse or sexual touching of the children, let alone a pattern of such conduct,[14] had in fact ever occurred, either by Parrish or by Megan. Moreover, it is not at all clear that the evidence would have supported such a finding.[15] Yet, absent

---

[14]While it is well established that the judge may rely upon past parental conduct in determining current parental fitness, particularly in G. L. c. 210, § 3, proceedings there must be.evidence of "patterns of ongoing, repeated, serious parental neglect, abuse, and misconduct." *Adoption of Diane*, 400 Mass. 196, 204 (1987). See *Adoption of Carlos*, 413 Mass. 339 (1992) (no evidence of chronic abuse); *Adoption of Mary*, 414 Mass. 705 (1993) (ongoing, repeated patterns of serious parental neglect and physical and sexual abuse); *Adoption of George*, 27 Mass. App. Ct. 265 (1989) (twelve-year pattern of neglect, violence on "tragically ample" evidence). In the case before us, there was neither a finding of any pattern of neglect or abuse, nor support in the evidence before the court for such a finding. For some indeterminate period prior to their removal from their mother's care, the children had been neglected. Then they were removed after one intervention by DSS and have not again been in their mother's care. Any sexual abuse that may have occurred was prior to the end of 1989 and also cannot be said, on this evidence, to be part of a pattern.

[15]The trial judge indicated that, to the extent she accepted them in evidence, she would consider out-of-court statements made by the children to third parties concerning sexual abuse only for the children's state of mind and not for their truth. This would presumably encompass statements made to DSS social workers and therapists, whether recited during live trial testimony or in exhibits such as the § 51A reports and affidavit. It does not appear that the judge relied on the guardian ad litem's report in this regard. The children's statements were not introduced through any available exceptions to the hearsay rule, such as G. L. c. 233, § 82, which would have required the judge, prior to admitting them for their truth, to have made specific findings as to their reliability. *Care & Protection of Rebecca*, 419 Mass. 67, 78 (1994). Hearsay statements of the children in § 51A reports and the social worker's affidavit may not be considered substantively by the judge as evidence of sexual abuse. *Care & Protection of Inga*, 36 Mass. App. Ct. 660, 663-664 (1994). Cf. *Custody of Michel*, 28 Mass. App. Ct. 260, 267 (1990). The judge's extensive references to such reports, however, suggest that they were improperly considered substantively. This is so as well with respect to explicit references made in findings as to what the children told third parties (e.g., Megan Ruth "stated [to] her foster mother that all three children were forced to watch porno-

a finding of sexual abuse by Parrish and/or Megan, the judge's other findings concerning the impropriety of Megan's responses to allegations of sexual abuse and her inability or unwillingness to protect the children from sexual abuse lose their force as any basis for the conclusion of current parental unfitness. Indeed, even if sexual abuse by Parrish had been found to have occurred, the judge made no finding that Megan had ever left Parrish alone with her children after learning of his alleged sexual abuse of them. There was no finding, moreover, that Megan knew of any such abuse prior to the allegations being raised in October, 1989.

The judge's findings are silent, too, as to Megan's termination of her relationship with Parrish well before trial. The findings do not explain why, now that Megan with the help of therapy has acknowledged Parrish's sexual abuse of her children and now that Parrish is out of their lives, the court nonetheless concludes that Megan is and will be unable to protect her children from further sexual abuse. A mother's termination of her relationship with the abuser or her refusal to do so has been of significance in numerous decisions and

---

graphic movies and then were told to go to their rooms to practice what they had seen").

Other than the children's statements, which were not admitted for their truth, there was little evidence to support a finding of sexual abuse by Parrish and virtually none to support a finding that Megan had sexually touched Stuart. No physical evidence or corroborative evidence of abuse was introduced. Even if the therapists' beliefs that sexual abuse occurred were to be viewed as expert opinions admitted without objection (despite the fact that such opinions are ordinarily inadmissible, *Care & Protection of Rebecca*, 419 Mass. at 83, citing *Commonwealth* v. *Colin C.*, 419 Mass. 54, 59-61 [1994], and *Commonwealth* v. *Rather*, 37 Mass. App. Ct. 140, 147-148 [1994]), and the opinions (but not the facts on which they are based) were to be accorded their full probative value by the judge, it is doubtful that such evidence standing alone would support a finding of sexual abuse. We need not reach the open question of whether a finding of sexual abuse need be proved in a G. L. c. 210, § 3, proceeding by clear and convincing evidence or merely by a preponderance of the evidence as in the less extreme setting of G. L. c. 119, § 24, proceedings. See *Adoption of Kimberly*, 414 Mass. 526, 532 (1993); *Care & Protection of Laura*, 414 Mass. 788 (1993); *Care & Protection of Rebecca*, 419 Mass. at 81. The evidence before the trial court would not appear to satisfy either burden of proof.

bears on the mother's ability to protect her children from further abuse. *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption*, 395 Mass. 180, 186-187 (1985). *Adoption of Kimberly*, 414 Mass. 526, 529 (1993). *Adoption of Mary*, 414 Mass. 705, 711 (1993). *Adoption of Carla*, 416 Mass. 510, 519-520 (1993). *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 20 Mass. App. Ct. 689, 695 (1985). *Care & Protection of Isabelle*, 33 Mass. App. Ct. 548, 549 (1992).

It is clear from the judge's findings that her determination of parental unfitness depended largely on the underpinning that sexual abuse had occurred, that Megan responded inappropriately, and that she thereby has shown that she cannot protect her children. On the scant competent evidence before the court concerning the occurrence of sexual abuse, it cannot be said that unfitness on this basis was proved by clear and convincing evidence. See *Custody of Eleanor*, 414 Mass. at 800-801; *Custody of Jennifer*, 25 Mass. App. Ct. 241, 243-244 (1988).

Nor did the judge's findings adequately take into account "the personal qualities of the mother, such as her temperament or character, her mental stability, her present home environment, the relationship between the mother and [each] child, and the positive and negative aspects of returning [each] child to the mother." *Adoption of Harriet*, 29 Mass. App. Ct. at 113. The findings made are not of assistance in determining whether the court considered the continuing desire of each child, despite years of separation, to see and be reunited with Megan, the kind of care which each child requires and why Megan is or is not able to provide it, the level of Megan's compliance with DSS service plans and the appropriateness of such plans, the report made by the guardian ad litem,[16] the progress that Megan has made since the chil-

---

[16]The guardian ad litem's report as well as her trial testimony is equivocal as to whether Megan is currently a fit parent. Recognizing that Megan was unfit in 1989 when the children were removed, the guardian comments that DSS has not given Megan the opportunity to show that she is currently a fit parent and that there is no evidence to show whether or not she is in light of Megan's inability to have contact with the children. The

dren were removed, including therapy and training she received in parenting skills while in prison, and the progress she had made since her release from prison. "A judge whose order will have the effect of irreversibly terminating the legal parent-child relationship must focus on the present circumstances of the parent and the child, taking into account recent positive gains (if any), and, in appropriate cases, the likelihood of future improvement, in a parent's ability to care for the child who is the subject of the petition." *Adoption of Paula*, 420 Mass. 716, 731 (1995). See *Adoption of Carlos*, 413 Mass. at 349-351.

The findings before us do not demonstrate that the present circumstances of Megan, Stuart, Megan Ruth, and Carrie Kramer or the likelihood of future improvement in Megan's parenting abilities were adequately considered. Accordingly, the conclusion of current parental unfitness is unwarranted by the findings made, which do not clearly and convincingly establish Megan's unfitness to parent at the time of trial.

2. *The adoption plan.* General Laws c. 210, § 3(*c*), as amended through St. 1972, c. 800, § 2, states that "[i]n determining whether the best interests of the child will be served by issuing a decree dispensing with the need of consent [to adoption] . . . the court *shall* consider . . . the plan proposed by the department or other agency initiating the petition" (emphasis supplied). The trial judge made no finding in this case with respect to DSS adoption plans for Stuart, Megan Ruth, and Carrie, and we have no basis for concluding that any such plans were ever considered by the trial court.

No written adoption plan was put in evidence. DSS's contention that a plan adequate for the purposes of G. L. c. 210, § 3(*c*), was offered through the testimony of the children's therapists and the adoption social worker is without merit. Although adoption rather than reunification had apparently been the DSS goal for this family since 1990, none of the

guardian recommends that the children remain out of the home, that visitation be resumed, and that Megan be given the chance to show whether or not she can parent her children.

children was in preadoptive foster care at the time of trial. It was in late August, 1993, roughly two months before trial, that DSS contracted with D.A.R.E. Family Services to recruit adoptive homes for the children. At the time of trial, the D.A.R.E. adoption social worker had met only once, briefly, and at the same time, with both Megan Ruth and Carrie; she had not met Stuart at all. The adoption social worker had not spoken with the children's therapists or with the guardian ad litem. She was accordingly unable to testify as to what type of home would be suitable for each of the children (e.g., one or two parents; their gender; presence or absence of other children [younger or older] in the adoptive home). The adoption social worker was also unable to testify as to whether any or all of the Kramer siblings could or should be placed together in an adoptive home. On this record, there was no adoption "plan," as that word is ordinarily used and understood, before the judge. Dispensing with parental consent to adoption in the absence of such a plan was error.

To be sure, the statute does not require that a "fully developed" adoption plan be considered by the court. *Adoption of Paula*, 420 Mass. at 722-723 n.7. The adoption plan must, however, have content and substance enough to permit the court meaningfully to evaluate and consider, as the statute mandates, what DSS proposes to do for the child by way of adoption. "When the department petitions the court for permission to dispense with consent to adoption for a particular child, it must submit to the court a plan detailing where it proposes the child will be placed if permission is granted. . . . Although the department is not required to identify prospective adoptive parents in this plan, it must provide sufficiently specific and detailed information with respect to the prospective adoptive parents and their family environment so that the judge may properly evaluate the suitability of the department's proposal." *Care & Protection of Three Minors*, 392 Mass. 704, 717 (1984). See *Petition of the Dept. of Pub. Welfare to Dispense With Consent to Adoption*, 6 Mass. App. Ct. at 479.

3. *Further proceedings.* Because the judge's findings do not support the conclusion of current parental unfitness by clear and convincing evidence and because the trial court failed to consider DSS adoption plans for the three children, we reverse the judgments dispensing with parental consent to adoption. DSS continues to have permanent care and custody of all three children and the mother remains free to seek, pursuant to G. L. c. 119, § 26, such review and modification of prior orders, including orders regarding visitation, as may be appropriate.[17] Should DSS determine that its goal for any or all of the Kramer children remains the termination of parental rights under G. L. c. 210, § 3, it may proceed to a new trial on the petitions as to which this court today vacates the decrees.[18] Any such proceedings shall be consistent with this opinion.

At oral argument, we were informed that Megan Ruth and Carrie have been in a preadoptive placement since early

---

[17]Given the outcome of this decision, we have not addressed the children's contention that DSS has failed to provide adequate services for the reunification of the family, thereby failing in its responsibility under G. L. c. 119, § 1, to attempt to strengthen the family unit before proceeding to sever family ties permanently. *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 20 Mass. App. Ct. at 699. Certainly, this subject may be pursued at any new trial under G. L. c. 210, § 3. However, we note with concern the observations of the guardian ad litem in this regard, as well as DSS's change in goal for the children in 1990, just prior to Megan's incarceration, from reunification to adoption. This goal change, as well as the decline and then cessation in 1992 of visitation and contact between mother and children, suggests the possible commencement of a vicious cycle where an assessment of current fitness to parent cannot be based on current information. We note as well the wisdom of DSS's considering carefully whether sexual offender counseling and, in effect, its requirement that Megan confess that she sexually touched Stuart remain reasonable, where there may be some cause to doubt that such misconduct occurred. *Care & Protection of Rebecca,* 419 Mass. 67, 84-85 n.15 (1994). Moreover, DSS shall, if it has not already done so, institute a service plan forthwith which takes into account the mother's changed circumstances since 1989 and explore fully, and encourage if appropriate, the prospect of visitation rights.

[18]The parties may thereby avoid the delay and expense of new service of process, pretrial discovery, and other pretrial proceedings, subject to such other procedural orders of the Probate Court in this regard as may be appropriate.

1995. This is the home of Megan Ruth's therapist, who testified at trial for DSS and on whose testimony the judge clearly relied in her findings. This recent development raises grave concern regarding potential conflicts of interest and the reliability of this expert's testimony. We were also informed that DSS's goal as to Stuart has ceased to be adoption and has become long-term substitute care. If such be the case, we question, but do not now decide, the propriety of further proceedings under G. L. c. 210, § 3, as to Stuart.

*Judgments reversed.*