ADOPTION OF INEZ
(and a companion case[1]).

No. 97-P-1019.

Suffolk. March 11, 1998. - July 10, 1998.

Present: KASS, JACOBS, & PORADA, JJ.

Further appellate review granted, 428 Mass. 1107 (1998).

*Adoption,* Care and protection, Dispensing with parent's consent. *Parent and Child,* Adoption, Care and protection of minor, Dispensing with parent's consent to adoption. *Minor,* Adoption, Care and protection. *Evidence,* Child custody proceeding.

A Juvenile Court judge's findings and conclusions, that a young teenage mother was unfit and that it would be in her two children's best interests that the mother's parental rights be terminated, were not supported by clear and convincing evidence, and the judge's orders dispensing with the mother's consent to adoption were vacated and the matter remanded for further proceedings. [177-184]

PETITIONS filed in the Boston Division of the Juvenile Court Department on March 30, 1993, and January 18, 1995.

The cases were heard by *Mark E. Lawton,* J.

*Patricia A. Cantor* for the mother.

*Virginia A. Peel* for Department of Social Services.

*Stewart A. Engel* for the son.

*H. Crowell Freeman, Jr.,* for the daughter.

JACOBS, J. Diana, born on July 6, 1978,[2] has lived most of her life in the temporary or permanent custody of the Department of Social Services (department). When she was fourteen years old, she gave birth to a daughter, Inez, and, when she was sixteen, to a son, David. Each child was placed in the temporary

───────────

[1]Adoption of David. Both children's names as well as those of the mother and the foster mother are fictitious.

[2]As found by the judge and indicated in the court appointed investigator's first report, this birth date is not disputed by the parties in their briefs, although it is stated to be July 12, 1977, in the records of the Department of Social Services admitted in evidence.

legal custody of the department shortly following birth. In due course, that status was changed to permanent custody, and on February 6, 1997, when Diana was eighteen years old, a judge of the Boston Juvenile Court, acting pursuant to G. L. c. 210, § 3, and relying entirely on documentary evidence, found her to be an unfit parent and determined that the best interests of the children would be served by not requiring Diana's consent to their adoption. Diana appeals from the ensuing judgments as they apply to her.[3]

We set forth the procedural background and judge's findings in considerable detail because we believe that when read together, they reflect neither the close attention to the evidence nor the clear and convincing proof of unfitness required to support permanent legal severance of a mother's natural ties to her children. See *Custody of Eleanor*, 414 Mass. 795, 801 (1993). Instead, what emerges is a process unduly driven by the difficulties attendant to Diana's giving birth to two children when she was but a child herself and a result reached without sufficient attention by the department and the judge to signs of her maturation as a person and a parent.

1. *Procedural background.* On March 30, 1993, the day following her birth, Inez was placed in the temporary custody of the department pursuant to a petition filed in accordance with G. L. c. 119, § 24. At a proceeding held on September 7, 1993, and attended by Diana and counsel for all parties, the attorney for the department stated that although he had indicated at an earlier pretrial conference that he was seeking a finding of unfitness, he now was amending that position "to just asking for continued temporary custody." The case was continued almost monthly thereafter until December 21, 1994, at which time the judge was advised that Diana's absence was excused "by agreement of the parties" due to her being "8.6 months pregnant with her second child." At this proceeding, which the judge labeled "[a] hearing on the merits," another lawyer representing the department asked for a permanent custody order and stated that Diana "has a horrible history of parenting." Diana's attorney argued that her client had been acting responsibly and essentially opposed consideration of permanent

[3]The father of the daughter has not appealed the judgment dispensing with his consent. Blood tests ruled out the person named by Diana as the biological father of her son. Accordingly, no judgment was entered with respect to any putative father of David.

custody at that time. The judge, without taking testimony, immediately indicated that he was entering findings of unfitness and granting permanent custody to the department. No such findings appear in the record.

On January 18, 1995, ten days after his birth, David was placed in the temporary custody of the department pursuant to G. L. c. 119, § 24. In the latter part of 1995, the department amended its care and protection petitions to seek termination of parental rights with respect to both David and Inez pursuant to G. L. c. 210, § 3. At a proceeding attended by Diana on March 12, 1996, her attorney[4] indicated that he and Diana were disturbed by the department seeking termination of her parental rights. The court granted a continuance to March 21, 1996, at which time, with Diana and all counsel present, the court received in evidence various reports and letters with respect to both David's and Inez's cases. The parties indicated their agreement to permanent custody of David being awarded to the department and to a sixty-day continuance of the termination hearing. Diana addressed the court, stating she was in agreement "with what is going on" and that "[i]f the department is willing to give me a chance and the Court is willing, . . . I'll take that . . . offer . . . because I really do want to be a part of my children's life." The judge noted that the department now had permanent custody of both children and that the cases would be continued "while we see whether or not you're going to change your ways. If you don't, I'm dispensing with required consent and everybody will live happily ever after."

At a proceeding held on May 22, 1996, with Diana present, her attorney asked for a further continuance to permit Diana to return to South Carolina "where she had established some roots" and indicated she was going to be working there, finishing her education, and taking parenting classes in the hope that a home study would allow for the children ultimately to be sent to South Carolina. The judge continued the matter until September 25, 1996. After several further continuances, unexplained in the record, a "best interest" proceeding was conducted on February 6, 1997, with only the attorneys present. Diana's attorney objected on the ground that his client was not present. At that time, adoption plans and additional letters and

---

[4]This attorney originally had been appointed to represent Diana in David's case. After consolidation of the cases, he represented her in both cases.

reports were marked as exhibits.[5] After statements by counsel, and without taking testimony, the court that same day entered an order terminating Diana's rights pursuant to G. L. c. 210, § 3.[6]

2. *Judge's findings and conclusions.* The judge drew the following findings entirely from the documentary submissions: Before giving birth to Inez, Diana "continuously ran from her foster and residential placements to return to her parents," only to suffer physical abuse and again be placed in foster care. Diana was tested "at Westwood Lodge" and was "diagnosed on Axis I as Attention Deficit Disorder and Axis II as Borderline Personality Disorder."

During her first pregnancy, Diana was asked to leave several placements due to what variously was described as "difficult behavior," "lack of cooperation," and, in one instance, her involvement in a "physical altercation" with another resident. She left another placement after an argument with a member of her foster family. Toward the end of the pregnancy, she lived first with a paternal aunt and then with Ms. Smith, a maternal aunt. Following her birth, Inez was placed with Diana at Ms. Smith's home.

During her pregnancy, Diana had stopped attending school after having been suspended several times. Shortly after Inez's birth and until October, 1994, she attended a school to which she had been referred by her social worker. She also went to weekly counseling and parenting classes at the Roxbury Comprehensive Health Center, but "was inconsistent in attending these classes and eventually stopped attending." During that period, she completed the sessions of a "teen parent support group" at the same center. On one occasion in May, 1993, Diana, without permission, went to New Hampshire with Inez and did not return until the next morning. Due to this incident, the department transferred Inez to a foster home separate from that of Diana. "Initially, [Diana] was inconsistent in attending her visits with [Inez]" after the separation.

---

[5]The record indicates that over the course of the proceedings, a total of nineteen department letters and reports were admitted in evidence (only sixteen appear in our record), together with five letters submitted by Diana, two adoption plans, two reports of a court appointed investigator, a blood test report, a service plan and a "303" plan. None of the submissions was redacted.

[6]Both the docket and a statement by the court indicate that the order was entered on February 6. The judge's findings of fact, conclusions of law, and order were dated March 20, and were filed on March 25, 1997.

In August, 1993, Diana was permitted to live with a paternal aunt. While staying with that aunt, Diana "missed her curfew several times and was on the run twice." In June, 1994, Inez was again placed with Ms. Smith. Approximately five months thereafter, Diana, then pregnant, was again placed with Ms. Smith.

Prior to David's birth in January, 1995, Diana "was inconsistent in attending her prenatal care appointments." After David was placed with Ms. Smith, Diana would take him out beyond her curfew and stay away from home "for days at a time." She also missed "many days" of school. During this time, Ms. Smith was David's primary caretaker and she "continuously" had to show Diana how to properly clean and care for him. By the spring of 1995, Diana was attending an educational program at Madison High School. In April, 1995, she stayed out for two nights, with David, without permission.

At the end of April, 1995, she left Ms. Smith's home with David. A little over a month later, she telephoned her social worker requesting to be placed in an independent living situation with David. At that time, she would not reveal her address or phone number to her social worker. Her whereabouts remained unknown until August 31, 1995, when her social worker was informed that a child abuse and neglect report had been filed in South Carolina with respect to David. Within a week, David was removed from Diana's care, returned to Massachusetts, and placed in a foster home. While in South Carolina, David had developed a severe ear infection and cold for which Diana had not sought medical care. Three days after David's removal, Diana telephoned her social worker asking that both of her children be returned to her in South Carolina. At that time, she revealed her address and telephone number. In January, 1996, Diana telephoned her social worker, informed her that she continued to reside in South Carolina and requested visitation and placement of her children in foster care with a friend in South Carolina. The social worker explained to her the need for her friend to complete "a home study packet in order for an interstate compact to be completed on that home."

In January, 1996, after the social worker attempted to telephone Diana a number of times and sent her a letter requesting that she contact the department, Diana telephoned and requested a visit with her children. On February 6, 1996, she again telephoned her social worker requesting that David be

placed with a friend in South Carolina. The need for a home study was again explained to Diana and, on February 15, 1996, she telephoned the social worker with the name of a friend who was willing to care for David. Her friend "never completed the home study process as required."

In March, 1996, the social worker scheduled a visitation, and Diana returned to Boston. From March 22, 1996, until she returned to South Carolina on May 23, 1996, Diana visited with her children weekly, except for two weeks. During that stay, she participated in individual and group therapy and a parenting group at the Roxbury Comprehensive Community Health Center.

On May 31, 1996, Diana telephoned the social worker and disclosed an address and telephone number where she could be reached in South Carolina; she also scheduled a visit in Massachusetts for July 19, 1996. She did not appear for that visit, nor did she telephone to cancel it. In August, 1996, a social worker made several attempts to telephone Diana, and eventually was told that Diana no longer resided at that address and to stop telephoning that number. On August 26, 1996, Diana telephoned the social worker and stated that she had returned to Boston and wanted to visit with her children. A scheduled visit was canceled when Diana again telephoned and informed the social worker that she was pregnant and not feeling well. The visit was rescheduled for September 17. Diana did not appear at nor phone to cancel this visit.

In October, 1996, Diana went to Ms. Smith's home and requested to see her children. After Ms. Smith told her to contact the department, Diana telephoned her social worker, requesting a visit. "When confronted about visiting her children's foster home, [Diana] ended the conversation." Approximately a week later, she again went to Ms. Smith's home and requested to see her children. She left after Ms. Smith told her she needed to speak with her social worker and threatened to telephone the police.

In November, 1996, Diana wrote to the social worker stating she had moved back to South Carolina. Later that month, Diana again wrote to the social worker and requested that she be permitted telephone contact with her children. The social worker thereafter attempted to contact Diana by telephone and letter, but received no response. By November, 1996, Diana had enrolled in "parenting-family and adult literacy programs in [a school district] in South Carolina."

The judge concluded his factual findings with the following paragraph:

"Mother is unable to care for [David or Inez]. Mother has never been the primary caretaker for either child, except when she fled to South Carolina with [David]. Mother has not consistently engaged in services, and for months at a time was not involved with any services. Also, Mother has not consistently maintained contact with [David or Inez]. Mother has not demonstrated an ability to care for [David or Inez] and it is unlikely that her inability to parent will change in the near future."

After indicating his approval of the department's plans for adoption of the children by Ms. Smith, the judge stated that seven of the factors set forth in G. L. c. 210, § 3, were relevant. He supported those selections with factual conclusions based upon the findings previously set out in his decision.

3. *Discussion.* The proof here, as reflected in the judge's subsidiary findings, does not constitute clear and convincing evidence of Diana's unfitness and that it would be in the children's best interests that her parental rights be terminated. Moreover, the letters and reports relied upon by the judge and given credence in his findings contain considerable contrary information that inexplicably is passed over in his decision. Compare *Adoption of Iris,* 43 Mass. App. Ct. 95, 101 (1997). The oversight is especially apparent with respect to the investigator appointed by the court pursuant to G. L. c. 119, § 24, whose reports generally are regarded as the "most reliable source for the development of an informed assessment of a family's background." *Adoption of Paula,* 420 Mass. 716, 725 (1995). We allude to that overlooked information, not merely to weigh facts, as is our province given that the evidence is entirely documentary, *Stamper* v. *Stanwood,* 339 Mass. 549, 551 (1959); *Bluhm* v. *Peresada,* 5 Mass. App. Ct. 766, 766 (1977), but also to demonstrate that the judge did not give the requisite close scrutiny to the evidence nor adequately consider "the likelihood of future improvement" in Diana's parenting abilities. *Adoption of Paula, supra* at 731. See *Adoption of Iris, supra* at 101-102, and cases cited.

"Clear and convincing proof involves a degree of belief greater than the usually imposed burden of proof by a

preponderance of the evidence, but less than the burden of proof beyond a reasonable doubt imposed in criminal cases." *Custody of Eleanor*, 414 Mass. at 800, quoting *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 871 (1975). In enforcing that demanding standard, we are not unmindful of the awesome responsibility shouldered by judges in child welfare cases, see *Custody & Adoption of Ned*, 28 Mass. App. Ct. 557, 559-560 (1990), especially in the context of a juridical system which encourages "prompt and final resolution," *Adoption of Frederick*, 405 Mass. 1, 5 (1989), and not "wait[ing] for inevitable disaster to happen," *Adoption of Katharine*, 42 Mass. App. Ct. 25, 32 (1997), while at the same time requiring the exercise of "utmost care," *Custody of Two Minors*, 396 Mass. 610, 619 (1986), and inveighing against giving blind deference to department professionals. *Care & Protection of Three Minors*, 392 Mass. 704, 718 (1984).

The unfitness aspect of the core cognate tests of parental unfitness and the child's best interests generally requires some proof of "[e]ndangerment of the child from abuse, neglect, or other [harmful] activity." *Adoption of Katharine, supra* at 28. Here, except for the isolated multiple hearsay report that Diana, while in South Carolina, did not seek medical care for David's ear infection and cold, there is no evidence establishing that Diana in any way mistreated the children or that they suffered any harm when, on several occasions, she temporarily took them from foster care. Rather, there is verbatim reliance by the judge on the conclusory reports of a department social worker and supervisor, couched in the language of G. L. c. 210, § 3(c) (viii), that "[t]here has been a lack of effort by mother to remedy conditions which create a risk of harm due to neglect of [David]." Those reports do not specify either the conditions requiring remediation or the nature of the resulting risk or why that risk justifies judicial intervention beyond maintaining legal and physical custody of Inez and David in the department and Ms. Smith.

We construe the judge's conclusion that Diana is "unable" to care for Inez and David as referring to something other than her physical or intellectual ability, since there is no evidence of physical or mental deficiency preventing Diana from giving appropriate care. On the contrary, one of her schools reported that Diana was "high functioning" and an instructor in an adult education course in which Diana had enrolled in 1996 wrote

that "[s]he is an extremely bright young woman, who has great potential." She was also described by the investigator as having demonstrated "significant strengths." He concluded that Diana "should be judged on her ability [and] not only on her family's history." He reported that it is Diana's ultimate goal to move with her children to South Carolina, where her father's family resides, and to attend college there. Both the investigator and Ms. Smith indicated that Diana is not involved with drugs or alcohol. The impact on her parenting skills of the reported diagnoses of attention and personality disorders, based on testing performed while Diana was approximately ten years old, is nowhere explained in the record or alluded to by the judge. See *Adoption of Quentin*, 424 Mass. 882, 888 (1997) ("When assessing parental fitness, it is not enough to state that a parent is mentally impaired, rather there must be a showing that the condition affects the parent's ability to care for the child"). Nor does he, in the course of his focus on Diana's numerous changes in placements, take note of the department's observation that her mother "sabotaged Diana's placements and encouraged her to run," or attempt to assess what effect that history of changing placements, often labeled as "instability" by the department, has upon Diana's fitness in light of her emancipation from both her mother and the department.

We turn to the other factors recited in the judge's decision: that, with one exception, she has never been the primary caretaker of the children; her general failure to maintain consistent contact with the children; and her inconsistent utilization of available self-improvement services. While those factors ordinarily may support a finding of current unfitness with respect to an adult parent, they may not be as telling when applied to a maturing adolescent, especially where, as here, there is no attempt by the department or the judge to take into account which aspects of Diana's perceived failings as a parent may be attributable to her youth, her pregnancies, and her experiences as a ward of the state, and there is no indication of any effort to explore the reasons for or the extent of her inconsistency in utilizing services or visiting with her children.

It is apparent that Diana's not having been the primary caretaker of her children is a circumstance dictated by her youth and status as a ward of the department. The record indicates that when separated from her daughter by the department, she sought and received increased visits and expressed concern over

the care Inez was receiving. At one point, after the birth of David, she asked the department to create an independent living situation for them. The investigator learned that, while living with Ms. Smith, Diana took the initiative in feeding and bathing David. She apparently also changed the baby, although Ms. Smith reported to the investigator that she had to tell Diana "three times" to do a better job. Ms. Smith reported the major issue between her and Diana centered not on the care of the children but on who was in charge of them and whether Diana needed permission to take the children out.

The judge's findings focus on Diana's taking Inez overnight to New Hampshire, missing an unspecified number of curfews at two of her foster homes, and sometimes taking one of her children with her, occasionally for "days at a time." In light of the absence of any record of harm befalling the children during these transgressions, those findings, at best, only weakly support the implication of irresponsible parenting behavior underlying the further finding that Diana is "unable" to care for Inez and David.[7] The great irony in this case is that whatever failings Diana exhibited in terms of responsibility largely were developed during the time that she herself was in the custody of the department.[8] As she explained to the investigator, "I wasn't used to curfews because I basically raised myself." Also, her flight to South Carolina with David should be assessed in light of the investigator's observation, not reflected in the judge's decision, that "[i]t seems apparent that if [Diana] leaves [Ms. Smith's] home without her baby she is unlikely to be able to regain custody."

In his conclusions of law, the judge adverts to seven of the factors inserted by St. 1992, c. 303, § 5, as being relevant. Common to four of those factors (G. L. c. 210, § 3[c][ii], [iii], [v] and [vi]), are the findings that Diana has not consistently engaged in and utilized offered services and has not consistently

---

[7]No attention is given in the judge's decision to the investigator's pointed conclusion that the department's "quick response" in separating Diana from Inez following the New Hampshire episode "suggests that [Diana] correctly assessed that the Department was in a rush to take her baby."

[8]When Diana was three years old, the department, reacting to her mother's alcohol abuse, placed Diana and her nine siblings in foster care. After several years, the children were returned to their mother's care. In 1986, after Diana and a sister were molested by an older brother, she again was placed in foster care. In 1990, Diana was placed in the permanent custody of the department.

maintained contact with her department social worker.[9] The judge refers to attendance at school or utilization of services by Diana in seven of his findings. In only two of those findings is any inconsistency in use or attendance noted. In one finding, the judge notes that Diana began attending weekly counseling and parenting classes to which she was referred by her social worker in May, 1993. Without any quantification, the judge further finds "[Diana] was inconsistent in attending these classes and eventually stopped attending." No attention is given to Diana's complaint that she did not wish to attend classes without her baby while the other mothers had their children with them, nor to the validation of that objection by the investigator's recommendation that Diana should be permitted to bring Inez to the parenting class "to make this service more meaningful." The second finding states in its entirety: "Prior to November, 1994, [Diana] was inconsistent in attending her prenatal care appointments."

Counterbalancing these findings are those in which the judge found that Diana, on a referral by her social worker, attended the Massasoit School program between April, 1993, and October 1994; that she completed the teen parent support group sessions

---

[9]In pertinent part, the parental consistency requirements set forth in G. L. c. 210, § 3(c), as amended by St. 1992, c. 303, §§ 4 & 5, are as follows:

"(ii) the child . . . has been abused or neglected . . . [by parents who] were offered . . . services intended to correct the circumstances which led to the abuse or neglect and refused or were unable to utilize such services on a regular and consistent basis such that a substantial danger of abuse or neglect continues to exist;

"(iii) [department custody] . . . has lasted for at least six months and the parents have not . . . on a regular and consistent basis, accepted or productively utilized services intended to correct the circumstance;

"(v) . . . a court . . . has transferred custody of [a] child [younger than four years of age] . . . to the department . . . and, the child cannot be returned to the custody of his parents . . . ; provided, however, that the parents were offered or received services intended to correct the circumstance and refused or were unable to utilize such services on a regular and consistent basis;

"(vi) . . . there is reasonable expectation that the parent will not be able to provide proper care or custody within a reasonable time . . . ; provided, however, that the parents were offered or received services intended to correct the circumstance and refused or were unable to utilize such services on a regular and consistent basis;

"(viii) a lack of effort by a parent . . . to remedy conditions which create a risk of harm due to abuse or neglect of the child."

at a Roxbury health center in October 1993; that she was attending an educational program at Madison High School in the spring of 1995; that, "[f]rom March, 1996, until she returned to South Carolina on May 23, 1996, [Diana] participated in individual and group therapy and a parenting group at the Roxbury Comprehensive Community Health Center"; and, "[b]y November, 1996, [Diana] was enrolled in parenting-family and adult literacy programs in [a school district] in South Carolina." Absent in the findings is any reference to the following information contained in the record: (1) a September, 1993, department report in which Diana is referred to as being in "100% compliance" in her participation in a parenting skills group and in counseling; (2) a December, 1994, department report indicating that as of November 1, 1994, when Diana was approximately seven months pregnant, she "started to make her prenatal visits consistently"; and (3) a letter dated May 22, 1996, in which the department indicated that the case had been continued through March 21 until May 22, to give Diana an opportunity to prove her willingness "to work toward reunification of her children." That letter notes that Diana was in compliance with her service plan and in compliance with individual and group therapy services. It further notes that she was involved with a parenting group until such time as she found employment. At that time, Diana telephoned the department and requested another parenting class, but the department did not provide another agency because there were only two weeks left before Diana would be returning to South Carolina. The investigator, however, had earlier reported that Diana indicated she had completed a parenting class and showed him a certificate to that effect and that she had found this class without the department's help. Only when read selectively does the documentary record support either a conclusion of inconsistent utilization of services or a conclusion that "a substantial danger of abuse or neglect continues to exist." G. L. c. 210, § 3(c)(ii). Moreover, when Diana's circumstances are considered, these findings do not support convincingly the judge's statutorily based conclusion, see G. L. c. 210, § 3(c)(viii), that there was "lack of effort by [her] to remedy conditions which create a risk of harm due to abuse or neglect."

In his factual findings, the judge correctly noted that Diana "has not consistently maintained contact with [David or Inez]," and, in his conclusions of law, cited the statutory factor of "will-

ful failure to visit the child[ren]." See G. L. c. 210, § 3(c)(x). While these findings are supported in the record by several instances of canceled visits, failure to maintain contact with the department, and voluntary absences from the state and from the foster homes in which Diana and the children were placed, there is also substantial evidence of Diana's going to considerable lengths to maintain contact with David by seeking an independent placement and by taking him to South Carolina, and numerous instances of her visiting and attempting to visit with Inez. Relying on *Adoption of Carla*, 416 Mass. 510, 517 (1993), the judge correctly pointed out that prior patterns of parental neglect may serve as prognostic evidence of future parental fitness and likelihood of harm to the children. The record reflects no attempt, however, to factor into this calculus Diana's circumstances and youth and the likely effect, if any, of her maturing and of reaching her majority.

The remaining statutory factor relied on by the judge is that contained in G. L. c. 210, § 3(c)(vii), which states that "because of the lengthy absence of the parent or the parent's inability to meet the needs of the child, the child has formed a strong, positive bond with his substitute caretaker; the bond has existed for a substantial portion of the child's life; the forced removal of the child from the caretaker would likely cause serious psychological harm to the child; and the parent lacks the capacity to meet the special needs of the child upon such removal." That unsubstantiated conclusion of serious harm not only is lacking in significant underpinning in the documentary evidence, see *Custody of a Minor*, 389 Mass. 755, 768-769 (1983), it also is arrived at, as is the assessment of Diana's incapacity, without benefit of factual elaboration or expert evidence. See *Adoption of Katharine*, 42 Mass. App. Ct. at 30-31 & n.9 ("To the extent that traumatic severance of bonds with a substitute caretaker became a decisive factor, a judge would be bound in findings to describe the nature of the bonds formed, why serious psychological harm would flow from the severance of those bonds, what means to alleviate that harm had been considered, and why those means were determined to be inadequate").

Again relying on the prognostic value of past conduct, the judge found that Diana "has not demonstrated that she is currently able to adequately care for" Inez and David and that "it is unlikely that her inability to parent will change in the near future." The prediction of future or continuing disability as it

relates to current unfitness is particularly critical in the case of a callow teenage parent. Its basis must be firmly rooted in the evidence and clearly articulated in the judge's findings. See *Care & Protection of Bruce*, 44 Mass. App. Ct. 758, 763-764 (1998); *Adoption of Stuart*, 39 Mass. App. Ct. 380, 382 (1995). At this determinative decisional juncture, the judge is obliged to "clearly and convincingly" set forth the inferences and rationale supporting his conclusion. *Custody of Eleanor*, 414 Mass. at 799. *Adoption of Stuart, supra.* Here, we have no explanation of how Diana's perceived shortcomings render her unfit to parent or why further judicial intervention was required, given Diana's changing status and the fact that the children are in the care of the prospective adoptive parent. In the circumstances of a teenage parent who has not directly harmed her children and is not engaged in self-destructive conduct, the analysis may well require a basis of expert opinion. Moreover, "[t]roublesome facts, pointing to a conclusion contrary to that reached by the department or the judge, are to be faced rather than ignored." *Adoption of a Minor (No. 2)*, 367 Mass. 684, 688 (1975).

In sum, the record and findings before us provide insufficient support for the decrees dispensing with consent to the adoption of Inez and David. Accordingly, we vacate the decrees and remand the matter for a new trial, which is to include consideration of the effect, if any, of Diana's maturing and reaching her majority upon her current parental fitness and the best interests of the children, together with any relevant evidence developed since the previous hearing.[10,11]

*So ordered.*

---

[10]This disposition renders unnecessary any decision with respect to Diana's claim that her trial counsel was ineffective in not objecting to the admission of unredacted letters and reports to the court from department personnel.

[11]Prior to our hearing arguments in this case, a single justice of this court denied Diana's request for a stay of the appeal and for leave to file a motion for relief from judgment in the trial court supported by affidavits that Diana was married in July, 1997, and lives with her husband and a son born in April, 1997, in South Carolina, where she is employed part-time, enrolled in a vocational school, and receiving considerable support, training, and counseling from her church pastor and his wife. The affidavits also indicate that Diana lives in a home owned by her husband, a full-time engineering student, and that their son, in all respects, is well cared for by both of them. In light of our decision, it is unnecessary that we address the issue referred to the panel by the single justice: "whether a postjudgment change in circumstances is, standing alone, sufficient basis to set aside a judgment entered pursuant to G. L. c. 210, § 3."