## ADOPTION OF INEZ
## (and a companion case[1]).

Suffolk. December 10, 1998. - January 21, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.   ·

*Adoption,* Care and protection, Dispensing with parent's consent. *Parent and Child,* Adoption, Care and protection of minor, Dispensing with parent's consent to adoption. *Minor,* Adoption, Care and protection. *Evidence,* Child custody proceeding. *Practice, Civil,* Appeal, Record.

In a proceeding to dispense with parental consent to adoption, the judge's findings were supported by clear and convincing evidence and there was no error in his conclusions that the mother was presently, and would be in the future, unfit as a parent and that the two children's best interests would be met by freeing them for adoption. [720-721, 723-724]

PETITIONS filed in the Boston Division of the Juvenile Court Department on March 30, 1993, and January 18, 1995.

The cases were heard by *Mark E. Lawton,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Stewart A. Engel* for the son.

*Patricia A. Cantor* for the mother.

*H. Crowell Freeman, Jr.,* for the daughter.

*Virginia A. Peel* for Department of Social Services.

IRELAND, J. This is an appeal from the grant of care and protection petitions under G. L. c. 119, § 26, and petitions to dispense with parental consent to adoption pursuant to G. L. c. 210, § 3. After the petitions were granted in the Boston Division of the Juvenile Court Department, the Appeals Court reversed and remanded for a new trial to reconsider the petitions. *Adoption of Inez,* 45 Mass. App. Ct. 171, 184 (1998). We granted David's application for further appellate review and now affirm the judgment of the Juvenile Court.

1. *Facts.* We draw our facts from the trial judge's memoran-

[1]Adoption of David.

dum of decision, and we do not disturb those detailed findings unless they are clearly erroneous. See *Adoption of Quentin*, 424 Mass. 882, 886 (1997).

The Department of Social Services (department or DSS) first gained temporary custody of Diana and her nine siblings in May, 1982, when Diana was almost four years old. In 1990, the children were placed in the permanent custody of the department. From 1982 until 1995, Diana lived in a series of foster homes and residential placements. She repeatedly ran away from these homes to be with her mother, and then returned to foster care after suffering abuse.

During her first pregnancy, Diana lived in, and left, six different homes, either running away from them or being forced to leave because of a dispute with a member of a foster family. She was in foster care under the supervision of her maternal aunt when, at the age of fifteen years, she gave birth to Inez on March 29, 1993. The day after Inez's birth, the department filed a care and protection petition on the infant's behalf, received temporary custody of her, and placed her in foster care.

Diana initially lived with Inez in the same foster home. On May 9, 1993, Diana took Inez to New Hampshire overnight without permission, and without informing her foster mother about their whereabouts. As a result, DSS moved Inez to another foster home.

Diana spent time with Inez sporadically over the next two years. She was initially "inconsistent in attending her visits with [Inez]." Meanwhile Diana's life continued to be unstable. She lived in three different foster homes between August, 1993, and February, 1994, missing her curfew several times and running away twice.

During her second pregnancy in 1994, Diana did not consistently attend her prenatal classes. In November she again lived with Inez in the foster home of her maternal aunt. DSS gained permanent custody of Inez after a Juvenile Court trial in December, 1994.

In January, 1995, David, Inez's brother, was born. DSS gained temporary custody of him when he was only ten days old. He was placed at the same foster home with Diana and Inez. Diana's pattern of questionable behavior continued, however, as she "would take [David] out until late at night beyond her curfew, would stay away from the home for days at a time, and missed many days of school." She disappeared for two days

without explanation in April, 1995, and on April 21, 1995, she disappeared with David. She resurfaced in Estill, South Carolina, on August 31, 1995, when DSS learned that a neglect report had been filed in regard to David. While in South Carolina, Diana failed to seek treatment for David's severe ear infection. DSS recovered David on September 5, 1995, and returned him to foster care in Massachusetts.

Diana remained in South Carolina for almost one year. She did not see Inez between April, 1995, and March, 1996, when she returned to Massachusetts and began a schedule of weekly visits with the children. These meetings lasted until she returned to South Carolina in May, 1996. She scheduled a visit with the children for July but neither appeared nor called to cancel the visit. In August, she again returned to Massachusetts, and called her social worker to arrange for a September visit, which was scheduled, then rescheduled at her request. She did not appear for the visit with the children at the scheduled time.

In October, 1996, Diana twice attempted to make unauthorized visits with the children, who were both living with their foster parent, Diana's maternal aunt. The next month, she returned to South Carolina.

2. *Procedural background.* The department has had custody of David and Inez for nearly their entire lives. Eight separate hearings concerning Diana and the children were held before the same Juvenile Court judge between 1993 and 1997. In 1995 that judge allowed the department's motion to amend each care and protection petition to include a request to dispense with the need for Diana's consent to the adoption of David and to the adoption of Inez. As a result, hearings were held on March 21, 1996, and May 22, 1996. Diana was present and addressed the judge at both proceedings. After the hearings, the judge gave Diana "one last shot" to demonstrate her parental fitness. After another hearing, on February 6, 1997, the judge freed Inez and David for adoption and terminated Diana's parental rights to consent to or receive notice of the adoption of each child.

On March 25, 1997, the judge issued a memorandum of decision containing findings of fact and rulings of law in support of his February decision. The judge addressed seven of the thirteen factors set forth in G. L. c. 210, § 3 (c), relevant to determining fitness of a parent.

The Appeals Court reversed the judgment, concluding that neither the trial judge's finding of Diana's unfitness, nor his

conclusion that it was in the best interests of the children to terminate her parental rights, was supported by clear and convincing evidence. It examined the evidence anew and considered information "overlooked" by the Juvenile Court judge. *Adoption of Inez*, 45 Mass. App. Ct. 171, 177 (1998). The Appeals Court explained this de novo review as "our province given that the evidence [was] entirely documentary." *Id.*

3. *Discussion.*

a. *Trial court decision.* The trial judge did not err by dispensing with Diana's parental rights to consent to Inez's and David's adoption.

The judge must examine the best interests of the child in deciding to dispense with parental consent to adoption. See G. L. c. 210, § 3 (*a*) (ii); *Adoption of Paula*, 420 Mass. 716, 730 (1995). While parents have a constitutionally recognized interest in maintaining the family unit, a "child's interest in freedom from neglect or abuse is absolute." *Care & Protection of Robert*, 408 Mass. 52, 62 (1990). An order terminating parental rights to consent or to receive notice of adoption "is proper only when there is proof, by clear and convincing evidence, that 'a parent is currently unfit to further the child's best interest.' " *Adoption of Paula, supra* at 731, quoting *Adoption of Carlos*, 413 Mass. 339, 348 (1992). General Laws c. 210, § 3, lists thirteen nonexclusive factors for consideration in these cases. See G. L. c. 210, § 3 (*c*).

We disagree with the Appeals Court's de novo review of the Juvenile Court judge's findings of fact. Review of a Juvenile Court judge's decision to dispense with parental consent is normally "not done to assess the evidence de novo, but rather to determine whether the judge's findings were clearly erroneous and whether they proved parental unfitness by clear and convincing evidence." *Custody of Eleanor*, 414 Mass. 795, 802 (1993). "[O]ur attitude toward a trial judge's decision in a custody appeal is one of substantial deference." *Adoption of Hugo, ante* 219, 225 (1998), and cases cited. "[O]ur task is not to decide whether we, presented with the same facts, would have made the same decision, but to determine whether the trial judge abused his discretion or committed a clear error of law." *Id.*

Sufficient evidence supports the Juvenile Court judgment. Diana's past behavior, including repeated disappearances and missed appointments, long periods of time without contact with

the children, unauthorized flights with the children, and an untreated illness of David, was enough to allow the judge to fear harm to the children and to find by clear and convincing evidence that Diana was an unfit parent. The judge did not have to wait for further injury to the children before concluding that Diana was unfit as a parent and that the best interests of the children were met by freeing them for adoption.

Diana argues that the judge's decision is grounded solely in documentary evidence, and, therefore, an appellate court should give no deference to the trial judge's findings. The Juvenile Court judge, however, considered more than documentary evidence. He heard Diana's personal statements made in open court, observed her demeanor, and conversed with her twice. After one of these discussions, he gave her a second chance to demonstrate her parental fitness. He was also familiar with the children, whose interests had been before him during eight hearings held over nearly four years. We have "recognize[d] that in this field it is neither possible nor desirable to make decisions with precision, and that 'much must be left to the trial judge's experience and judgment.' " *Adoption of Hugo, supra* at 225, quoting *Adoption of a Minor (No. 2)*, 367 Mass. 684, 688 (1975).

After reviewing the evidence before the trial judge, we conclude that the judge's findings were supported by clear and convincing evidence, and the judge did not abuse his discretion or commit a clear error of law.

b. *Supplemental affidavits.* We do not consider the supplemental affidavits Diana filed on appeal. The evidence was not before the Juvenile Court judge, summarized postappeal events, and was not properly admitted for consideration before the Appeals Court.[2]

On November 18, 1997, Diana moved for permission to file a supplemental appendix containing additional affidavits that had not been presented before the trial court. The proposed affidavits were from Diana, her pastor in South Carolina, and the pastor's wife, attesting to Diana's qualities as a parent and as a member of the local community. The next day a single justice of the Appeals Court permitted her to serve and file the appendix with her brief but "[i]ts propriety [was] referred to

---

[2]Diana admitted in her motion to the Appeals Court for leave to file a supplemental record appendix that "[t]he affidavits were not filed in the trial court and are submitted here for the first time."

the panel designated to decide the appeal." On July 10, 1998, the Appeals Court issued its opinion and without explanation ordered that no action was necessary concerning her motion to file the supplemental appendix.

The affidavits were the source of facts the Appeals Court discussed in detail in a footnote in its opinion.[3] *Adoption of Inez,* 45 Mass. App. Ct. 171, 184 n.11 (1998). They may also have been the basis for that court's reversal, in part, of a "result reached without sufficient attention by the department and the judge to signs of her maturation as a person and a parent." *Id.* at 172.

Diana's counsel should not have submitted the affidavits to the Appeals Court. Opposing parties had no opportunity to rebut the facts or examine each affiant because the affidavits were never before the trial judge, were not properly before the Appeals Court, and addressed issues and facts occurring after trial. Posttrial affidavits generally should be disregarded by a court reviewing a custody order.[4] To do otherwise would tempt parties to submit additional material on appeal, transforming appellate review into a new trial. This would undermine the Juvenile Court, and diminish finality and efficiency, important interests in custody proceedings. See *Adoption of Galen,* 425 Mass. 201, 206 (1997), and cases cited ("[i]t is in the best interests of children that there be a speedy resolution of adoption proceedings"); *Adoption of Frederick,* 405 Mass. 1, 5 (1989) ("public

---

[3]As part of its discussion remanding the matter for a new trial to consider "the effect, if any, of Diana's maturing and reaching her majority upon her current parental fitness," the court wrote:

> "Prior to our hearing arguments in this case, a single justice of this court denied Diana's request for a stay of the appeal and for leave to file a motion for relief from judgment in the trial court supported by affidavits that Diana was married in July, 1997, and lives with her husband and a son born in April, 1997, in South Carolina, where she is employed part-time, enrolled in a vocational school, and receiving considerable support, training, and counseling from her church pastor and his wife. The affidavits also indicate that Diana lives in a home owned by her husband, a full-time engineering student, and that their son, in all respects, is well cared for by both of them."

*Adoption of Inez,* 45 Mass. App. Ct. 171, 184 n.11 (1998).

[4]We, like the Appeals Court, do not answer the question "whether a post-judgment change in circumstances is, standing alone, sufficient basis to set aside a judgment entered pursuant to G. L. c. 210, § 3." *Id.*

policy encourages prompt and final resolution of custody issues").

c. *Future fitness.* The Juvenile Court judge did not err in his analysis of present and future parental unfitness in his order dispensing with Diana's consent to adoption, and freeing the children for adoption.

A judge, when deciding whether to dispense with consent to adoption, "must focus on the present circumstances of the parent and the child, taking into account recent positive gains (if any), and, in appropriate cases, the likelihood of future improvement, in a parent's ability to care for the child." *Adoption of Paula, supra* at 731. Predictions must be supported by "credible evidence," meaning they must be more than hypothetical. See *Adoption of Carlos,* 413 Mass. 339, 350 (1992). A judge may not decline to dispense with consent based on a faint hope that the family will succeed if reunited.

Evidence of future fitness must be more substantial in proceedings to dispense with consent to adoption than in a care and protection case. "[A]n estimate about the future rests on a more solid basis for justifying a temporary remedy ([such as] keeping the child under care and protection) than for an irrevocable one such as dispensing with consent to adoption." *Adoption of Katharine,* 42 Mass. App. Ct. 25, 33 (1997).

In *Adoption of Carlos, supra,* we recognized "[i]n determining whether that extreme step [terminating the parent-child relationship] should be taken, consideration of the future is a necessity." *Id.* at 350. For instance, the judge should explore whether "there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary." *Id.* Consideration of future fitness, however, should never be made at the expense of the child, whose interest is paramount.

The trial court judgment should not have been reversed on the ground that the judge did not "adequately consider 'the likelihood of future improvement.' " *Adoption of Inez, supra* at 177, quoting *Adoption of Paula, supra* at 731. The record contains no credible evidence demonstrating Diana's maturation that would have warranted the judge to conclude that Diana was only temporarily unfit. The judge did not err by determining that it would not be in the best interests of the children to delay their adoption until a future date when Diana might be able to provide for their well-being.

We also disagree with the Appeals Court's conclusion that

"[t]he prediction of future or continuing disability as it relates to current unfitness is particularly critical in the case of a callow teenage parent." *Id.* at 183-184. Minor parents should not retain parental rights until their maturation is sufficiently complete while adult parents are given no opportunity to "mature." Most importantly, to permit a minor parent time to mature before freeing a child for adoption could harm the child. Children of minor parents would have to wait to find permanent placements until their parents matured. Meanwhile, the conditions that forced them into the care of DSS would continue. At some point the court must say, "Enough," see *Adoption of Carlos*, 31 Mass. App. Ct. 233, 242 (1991), *S.C.*, 413 Mass. 339 (1992), and act in the children's best interests.

In sum, consideration of future fitness should never be made at the expense of a child's present and future best interests. Clear and convincing evidence exists here to support the Juvenile Court's conclusion that the children's best interests are in adoptions, as the DSS plan provides. From our review of the record, we conclude that the Juvenile Court judge did not abuse his discretion or commit an error of law.

4. *Conclusion.* The judgment of the Juvenile Court is affirmed.

*So ordered.*