Following trial, a Juvenile Court judge concluded that Yelena was a child in need of care and protection and that her parents were unfit to parent her. Decrees entered terminating their parental rights. Both parents have appealed. The father claims error in several of the judge's findings of fact and conclusions of law, and in his decision not to order postadoption visitation. The mother does not challenge the judge's finding that she is unfit and that termination of her rights is in Yelena's best interests, but claims that the judge abused his discretion when, on the seventh day of trial, he denied her fourth attorney's motion to withdraw. We affirm.
Background. We summarize the relevant facts, which have ample support in the record.
Yelena was born in December, 2012, and is the mother's second child. The mother's first child, Bethany,[3] was removed from her custody in 2008, after the Department of Children and Families (department) received several reports pursuant to G. L. c. 119, § 51A ( § 51A reports), alleging that the mother was severely intoxicated while caring for Bethany. Bethany's father was granted custody, and Bethany has lived with him in Peru since October, 2008.
Thereafter, the mother was homeless for a period of five years. In 2009, she began a relationship with the father after meeting him at a homeless shelter. The relationship was marked by domestic violence. The mother was repeatedly hospitalized, for both psychiatric reasons and alcohol abuse. In 2012, the mother became pregnant. The father obtained housing, and the mother moved in with him approximately one month before Yelena was born.
The department became involved with the family one month after Yelena was born. On January 29, 2013, the department received a § 51A report alleging neglect of Yelena as a result of the mother's psychiatric hospitalization. After the mother called the police multiple times between 4 A . M . and 5 A . M ., officers found her speaking nonsensically and tightly holding Yelena. The mother would not release Yelena and the child had to be forcibly removed from her arms. The mother had been caring for Yelena alone for a few days while the father worked nights.[4] A social worker was assigned to the case, and she spoke with both parents. The father told the social worker that he encouraged the mother to eat before she drinks, in order to coat her stomach.
On April 8, 2013, another § 51A report was filed after concerned citizens reported that a woman appeared intoxicated while carrying a baby on her chest. Responding police officers found the mother at a laundromat with the father. Yelena was in a baby carrier on the mother's chest. The mother had an odor of alcohol, her eyes were glassy, and she was unsteady on her feet. Yelena was removed from the mother and given to the father, who appeared to be sober. The family's assigned social worker developed an emergency plan whereby the parents would not use alcohol or bring alcohol into the home, and the mother would never be left alone with Yelena. Later that day, police responded to another report that the mother was staggering and falling. Officers found her leaving a liquor store with four twenty-four ounce cans of beer and placed her in protective custody.
On May 2, 2013, the parents fled to Maryland with Yelena. On May 9, 2013, the department filed an emergency petition alleging that Yelena was a child in need of care and protection. The family returned to the Commonwealth after Maryland's social services department located and took custody of Yelena. Thereafter, the department implemented numerous service plans in an effort to reunify the family. Among other things, the plans required the parents to meet monthly with the department and sign releases, engage in substance abuse and mental health evaluations, provide copies of the evaluations to the department, provide information for early intervention services for Yelena, call the foster mother twice per week to discuss Yelena's progress, and visit with Yelena. However, the parents' communication with the foster parents and Yelena's medical providers was terminated due to the mother's behavior. Thereafter, the parents' service plans were amended to include that they refrain from using or abusing alcohol following several instances of (1) domestic violence wherein both parents were drinking, and (2) the mother being taken into protective custody. The mother also appeared for visits with Yelena with an odor of alcohol. The father was required to attend a batterer's intervention program due to the incidents of domestic violence. He never completed this program because he does not believe he is a batterer.
The mother and the father were married and living together at the time of trial. The mother has denied her alcohol abuse and has not taken meaningful steps to address her problem. She does not believe that alcohol played a role in the removal of her children. Although the father is aware that the mother abuses alcohol, he does not believe that it places Yelena at risk. He testified that the mother is the most important woman in his life, that he would coparent with the mother if Yelena is returned to his custody, and that he cannot force the mother to stop drinking.
After analyzing the factors set forth at G. L. c. 210, § 3 (c ), the judge concluded that factors (ii), (iii), (iv), (vi), (vii), (viii), (ix), and (xii) supported his determination that the parents are unfit. The judge made 104 findings of fact and thirty-four conclusions of law, which "are both specific and detailed, demonstrating, as we require, that close attention was given to the evidence." Adoption of Don, 435 Mass. 158, 165 (2001). He determined that the parents' unfitness is likely to continue, such that termination of their parental rights is in Yelena's best interests.
Discussion. 1. Father's appeal. a. Erroneous findings. The father claims that several of the judge's factual findings are clearly erroneous. Those findings relate to the father's employment, his engagement in services, his level of insight into the mother's mental health and alcohol abuse issues, and his lack of knowledge of Yelena's special needs. These claims of error, however, challenge the judge's credibility assessments and his weighing of the evidence, to which we accord substantial deference. Adoption of Peggy, 436 Mass. 690, 702, cert. denied sub nom. S.T. v. Massachusetts Dep't of Social Servs., 537 U.S. 1020 (2002). The judge was in a "superior position to evaluate witness credibility." Adoption of Cadence, 81 Mass. App. Ct. 162, 166 (2012). Having carefully reviewed the nearly 2,000 page record in this case, we see no reason to disturb his view of the evidence. Adoption of Quentin, 424 Mass. 882, 886 n.3 (1997).
b. Unfitness. Taken together, the judge's findings amply support his ultimate conclusions that (1) the father has not corrected the deficiencies that render him unfit to parent Yelena or act in her best interests, and (2) termination of the father's rights is in Yelena's best interests. There was overwhelming evidence that the mother's alcohol abuse endangered Yelena. Yet the father has refused to address this chronic problem. He married the mother before the end of trial and testified that he planned to coparent with the mother if Yelena was returned to his custody. We do not fault the father's loyalty to the mother, but their continued relationship is not in Yelena's best interests. Their history of coparenting has significant "prognostic value," Adoption of George, 27 Mass. App. Ct. 265, 268 (1989), and the judge was not required to return custody of Yelena to the father and risk injury to her before concluding that the father is unfit and that termination of his rights is in Yelena's best interests. Adoption of Inez, 428 Mass. 717, 721 (1999).
"Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993). Mindful of this standard, we agree that there was clear and convincing evidence of the father's shortcomings that put Yelena's welfare in jeopardy. While it is clear from the record that the father loves Yelena, it is also clear that he lacks insight regarding the mother's alcohol abuse and has not recognized or taken responsibility for the danger it would pose to Yelena should she be returned to his care. Care & Protection of Three Minors, 392 Mass. 704, 712 (1984).
c. Postadoption visitation. The judge ordered posttermination visitation between the father and Yelena because "there was some evidence of a bond" between them. However, he declined to order postadoption visitation, "determining instead that it would be in the best interest of the [c]hild if postadoption visitation was left to the judgment of the adoptive family."[5] The father claims error in this visitation order.
It is well-settled that "[t]he judge may properly decline to order visitation when the adoptive parent's discretion to make decisions regarding contact will adequately serve the child's best interests." Adoption of Cadence, 81 Mass. App. Ct. at 168. The father does not claim that the adoptive parents will not act in Yelena's best interests. The purpose of postadoption visitation "is not to strengthen the bonds between the child and h[er] biological mother or father, but to assist the child as [s]he negotiates ... the tortuous path from one family to another." Adoption of Vito, 431 Mass. 550, 564-565 (2000). While a better practice would have been for the judge to provide a more detailed explanation of his reasons for declining to order postadoption visitation, there was ample evidence supporting his decision. Yelena has lived with the preadoptive family since she was five months old, and her relationship with the preadoptive parents represents the principal parent-child relationship in her life. See id. at 563-564. She "has formed strong, nurturing bonds with [her] preadoptive family." Id. at 563. In the circumstances here, where the preadoptive foster parents (1) have provided the principal parent-child relationship, (2) the department has approved adoption by the preadoptive parents, and (3) the preadoptive parents are open to Yelena's visitation with the father, we discern no abuse of discretion in the judge's assessment that leaving postadoptive visitation in the discretion of the adoptive parents was in Yelena's best interests.
2. Mother's appeal. Four attorneys were appointed to represent the mother over the course of the four years that this case was pending. Three of those attorneys were allowed to withdraw because they were not able to effectively communicate with the mother. The mother's fourth appointed attorney (trial counsel) sought to withdraw for the same reason shortly after he was appointed. That motion to withdraw was denied.
There were numerous delays in the pretrial proceedings due to the mother's failure to appear, her panic attacks, and the difficulty of securing a Russian interpreter for the mother.[6] Ultimately, the trial began approximately one year after trial counsel's appointment. At a sidebar conference preceding the seventh day of trial, the mother's trial counsel informed the judge that the mother again had asked him to withdraw. Consequently, trial counsel moved to withdraw on the grounds that (1) the mother did not believe he was advocating in her best interests, and (2) the mother was found competent to stand trial and wished to proceed pro se.[7] The judge denied the motion, reasoning that "competency to represent [oneself] in a proceeding before the court is a different type of competency and requires a different set of skills than competen[ce] to stand trial," and the "mother does not have that set of skills." He advised the mother of his conclusion that she could not receive a fair trial if she represented herself.[8] In response, the mother complained that her attorney "insists that I have a mental problems or I have hallucinations ... and I'm telling them that I have no psychosis, I've never had psychosis in my life ... I have no medical record." The judge interjected that "[w]e're not talking about that. We're talking ... about your ability to participate in this proceeding," and he stated that "[w]e're going to get through this trial."
We review the judge's denial of a motion to discharge counsel for abuse of discretion. See Kiley, petitioner, 459 Mass. 645, 649 (2011) ; Adoption of Olivia, 53 Mass. App. Ct. 670, 675 (2002). This discretion is especially broad when the request is made on the eve of trial or later. See Commonwealth v. Tuitt, 393 Mass. 801, 804 (1985). Before allowing an attorney's motion to withdraw, the trial judge "must be confident that [the moving party is] adequately aware of the seriousness of the [proceedings], the magnitude of [her] undertaking, the availability of advisory counsel, and the disadvantages of self-representation" (quotation omitted). Adoption of William, 38 Mass. App. Ct. 661, 665 (1995).
We are not persuaded by the mother's argument that the judge abused his discretion when he denied trial counsel's motion to withdraw without hearing the mother's stated reasons. The record reflects that the judge did consider the mother's reasons: that she had been found competent to stand trial and that she believed that trial counsel was not advocating in her best interests because he thought she suffered from mental illness. Indeed, the judge attempted to explain to the mother the difference between competency to stand trial and the ability to represent oneself in such a proceeding. The judge had presided over numerous pretrial conferences and six days of trial, in which he heard the mother testify. He was in the best position to assess the mother's ability to represent herself. Moreover, the judge properly weighed the potential for additional delay occasioned by the mother's midtrial request to proceed pro se against Yelena's right to a timely resolution of her case. See Adoption of Raissa, 93 Mass. App. Ct. 447, 455 (2018), quoting Custody of a Minor, 389 Mass. 755, 764 n.2 (1983) ("No cases of any kind have a greater claim for expedition at all stages than those involving care and custody of children"). In these circumstances, when the case had already been delayed because of the mother's failures to appear and disruptive behavior, the judge did not abuse his broad discretion.[9]
Decrees affirmed.

A pseudonym.

The father was employed part time as a personal care attendant.

The preadoptive parents are open to postadoption contact between Yelena and the father.

The mother was born in Russia and speaks Russian and English.

On August 11, 2015, the trial judge referred the mother to the Juvenile Court clinic for a competency evaluation based upon his observations of her behavior in court. The judge considered a September 11, 2015, report from the licensed clinical psychologist who evaluated the mother and found that she was competent to stand trial.

The judge stated, "You don't have any concept of the legalities that are going on," and he noted that she often needs the assistance of an interpreter when complex legal concepts and terms are discussed.

We reject the mother's assertion that the judge abused his discretion in declining to allow mother to proceed pro se with trial counsel acting as stand-by counsel. The mother made no such request.