NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-458

ADOPTION OF CHASE.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a one-day trial, a judge of the Juvenile Court found the father unfit to parent Chase, terminated his parental rights, and found the adoption plan of the Department of Children and Families (department) to be in Chase's best interests. On appeal, the father contends that the judge (1) erroneously terminated his parental rights given the department's failure to make reasonable efforts to reunify, (2) abused her discretion in finding his unfitness likely to continue, and (3) erred in terminating his parental rights before choosing between his and the department's competing adoption plans. We affirm.[2]

---

[1] A pseudonym.

[2] The mother is not a party to this appeal.

     Background.  We summarize the judge's findings of fact,
supplemented by uncontested evidence from the record.[3]

     In November 2023, on the same day that Chase was born, the
department received a report under G. L. c. 119, § 51A, alleging
neglect of Chase by his mother after Chase's urine tested
positive for cocaine and marijuana.[4]  During its G. L. c. 119,
§ 51B investigation, the department learned that the mother had
received limited prenatal care and used "crack" cocaine and
marijuana throughout her pregnancy.

     Following its investigation, the department was granted
temporary custody of Chase.  A temporary custody hearing was
scheduled for December 1, 2023, but was continued to December
19, 2023, after both parents failed to appear.[5]  Both parents
again did not appear on December 19, leading the judge to find
that they had forfeited their rights to a hearing.[6]  At a status

---

     [3] The trial judge made forty-seven findings of fact, and the
findings "demonstrate that close attention has been given the
evidence."  Custody of Eleanor, 414 Mass. 795, 799 (1993).

     [4] The judge made specific findings of fact about the mother,
which we include only as they bear on the father's parental
fitness.

     [5] It appears the father was not formally served with notice
of the proceeding.  However, the judge found that the department
investigator instructed the father to report to the Juvenile
Court to be served and appointed counsel.

     [6] The father had an open warrant for his arrest at the time
of Chase's birth, which the judge suggested could have
influenced his decision to not go to the courthouse.

hearing on April 29, 2024, neither parent appeared, and a trial date was set for July 29, 2024.[7]

After the department obtained custody of Chase, the father was offered services and action plans were created. The initial action plans required the father to, among other things, complete a substance abuse evaluation, engage in services to address mental health and anger management, attend parenting classes, obtain appropriate housing, participate in family visits once a week, provide provisions for Chase during visits, meet monthly with a social worker, and engage in domestic violence education. The father made efforts toward completing several of these tasks, but he was not able to achieve improvement in his parenting skills and judgment due to his lack of participation in services. Notably, the father did visit with Chase under the supervision of department social workers between November 2023 and April 2024, but during these visits, the father was often on the telephone with his sister, "appeared very uncomfortable," and did not bring provisions for Chase, such as diapers and clothing. Moreover, the father's living

---

[7] The father was being detained pretrial pursuant to G. L. c. 276, § 58A, on a thirteen-count indictment at the time of the status hearing. There was no trial date set on the criminal indictment at the time of the care and protection trial.

3

situation remained precarious, and he did not have a plan to care for Chase.

Additionally, the father has a history of violent and volatile behavior, including in front of Chase.  For example, shortly after Chase's birth, hospital security intervened and removed the father from the hospital room due to his aggressive behavior toward the mother and the department's workers.[8]  In April 2024, the father was arrested and detained "on dangerousness," pursuant to G. L. c. 276, § 58A, on a thirteen-count indictment involving illegal substances and firearms.  The father remained detained at the time of the care and protection trial.  The father's counsel requested that the father be physically present for trial and the court issued a writ of habeas corpus to ensure his appearance.

The department proposed that Chase be adopted by his foster parents, who had already adopted Chase's maternal half-sibling, and with whom Chase had lived "for nearly all his 8 months of life."  Alternatively, the father offered his sister as an adoptive resource for Chase.  However, because the father's sister lives in Vermont, an Interstate Compact on the Placement

---

[8] The father's behavior escalated after the department informed him and the mother that it would be removing Chase from their care and custody.

4

of Children (ICPC) home study was required but not completed by the trial date.

Following a trial on the merits, the judge issued a decree on July 30, 2024, terminating the father's parental rights and approving the department's adoption plan, though "the specific plan will require further approval of the Court."[9]

Discussion. 1. Reasonable efforts to reunify. The father argues that the judge erroneously terminated his parental rights given the department's failure to make reasonable efforts to reunify as well as the judge's failure to make a reasonable efforts determination, thereby resulting in an outcome "inconsistent with substantial justice."[10] Although we agree with the father that the department should have done more to schedule visits once the father was confined to a correctional facility, we conclude that its failure to meet its regulatory obligations in that specific regard does not require reversal.

---

[9] On January 30, 2025, the judge issued findings and conclusions in support of her determinations.

[10] The father raised the issue of reasonable efforts for the first time at trial. The father's claim on appeal is akin to "[a] claim of inadequate services[, which] must be raised in a timely manner to provide the judge and the department the opportunity to make accommodations while the case is pending." Adoption of Yalena, 100 Mass. App. Ct. 542, 554 (2021). Although the department maintains that the father waived his reasonable efforts claim by not raising it prior to trial, for purpose of this appeal, we assume without deciding that he preserved the claim.

5

"The department is 'required to make reasonable efforts to strengthen and encourage the integrity of the family before proceeding with an action designed to sever family ties.'" Adoption of West, 97 Mass. App. Ct. 238, 241 (2020), quoting Adoption of Lenore, 55 Mass. App. Ct. 275, 278 (2002).  Even when a parent is confined, the department's regulations require it to "make all reasonable efforts to work in cooperation with incarcerated parents to promote a healthy relationship with their children, and to avoid permanent separation."  110 Code Mass. Regs. § 1.10 (2008).  See Adoption of Franklin, 99 Mass. App. Ct. 787, 795 (2021).  These required "efforts shall include regular visitation at the correctional facility, as well as the holding of case conferences and other consultations at the correctional facility."  110 Code Mass. Regs. § 1.10.  However, the department's duty is contingent on a parent's fulfillment of his or her own parental responsibilities.  See Adoption of Mario, 43 Mass. App. Ct. 767, 774 (1997).

We agree with the father that the department's efforts to set up visits after the father was confined to the house of correction fell short of meeting its obligations.  The father testified at trial that he asked the department social worker to arrange for visitation with Chase, but that that request "was never accommodated."  The judge found that "no evidence was introduced to suggest he was denied [visits] by the Department,"

6

without reconciling the fact that the department presented no evidence that it made any attempts to set up visits with Chase and the father while the father was confined.  Regardless, even where the department did not make reasonable efforts, the judge can still "mak[e] any appropriate order conducive to the child's best interest."  G. L. c. 119, § 29C.  Ultimately, "[w]hile courts protect the rights of parents, 'the parents' rights are secondary to the child's best interests and . . . the proper focus of termination proceedings is the welfare of the child.'"  Adoption of Ilona, 459 Mass. 53, 61 (2011), quoting Adoption of Gregory, 434 Mass. 117, 121 (2001).

Outside of visits, the father also claims that the department did not provide him with adequate services to address his parenting deficiencies.  While the father might have benefited from additional services, especially while confined, the consequences of any department failure to provide those services must be viewed in light of the father's failure to make effective use of such services and opportunities when they were made available to him at other times.

Additionally, while the judge's findings of fact and conclusions of law do not include the requisite finding regarding whether the department had made reasonable efforts toward reunification, we conclude that a remand would serve no useful purpose here.  See Care & Protection of Rashida, 488

7

Mass. 217, 220 (2021), S.C., 489 Mass. 128 (2022). As stated supra, "even where the department has failed to meet [its reasonable efforts] obligation, a trial judge must still rule in the child's best interest." Adoption of Ilona, 459 Mass. at 61. Here, as discussed infra, the judge found that the father's "unfitness . . . is likely to continue into the indefinite future to a near certitude," and she concluded that Chase's best interests would be served by termination of the father's parental rights.

Where the father's unfitness was permanent, and where Chase's best interests warranted termination, nothing would be accomplished by remanding and requiring the department to provide reunification services. At this stage of the proceedings and of Chase's life, a hypothetical determination that the department reasonably should have done more at an earlier stage would not change the judge's disposition of the case.

2. Unfitness determination. The father next contends that the judge erred in terminating his parental rights because the facts as found were not sufficient to support a determination of likely indefinite unfitness. We disagree. When faced with a request to terminate parental rights, the judge must find by clear and convincing evidence that the parent is unfit, and that "the unfitness will continue undiminished into the future,

8

affecting the welfare of the child." Adoption of Lisette, 93 Mass. App. Ct. 284, 296 (2018). See G. L. c. 210, § 3 (c) (vi) ("reasonable expectation that the parent will not be able to provide proper care or custody within a reasonable time considering the age of the child"). "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age." Adoption of Anton, 72 Mass. App. Ct. 667, 673 (2008). The judge's subsidiary findings must be proved by a preponderance of the evidence and will only be disturbed if clearly erroneous. See Custody of Eleanor, 414 Mass. 795, 799 (1993). On review, we give "substantial deference to a judge's decision that termination of a parent's rights is in the best interest[s] of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Yalena, 100 Mass. App. Ct. at 549, quoting Adoption of Ilona, 459 Mass. at 59. "Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period." Id. at 60.

Predictions about a parent's unfitness must be "more than hypothetical," Adoption of Inez, 428 Mass. 717, 723 (1999). In determining future fitness, the judge "properly may consider a

9

pattern of parental neglect or misconduct." Adoption of Elena, 446 Mass. 24, 33 (2006).

Having carefully reviewed the record, "[w]e see no basis for disturbing the judge's view of the evidence." Adoption of Quentin, 424 Mass. 882, 886 n.3 (1997). Here, the judge considered the father's lack of preparedness to parent Chase, history of violence and anger management issues, and minimal of engagement in directed services and case proceedings.

Specifically, the judge found that the father's awareness of the mother's substance use history and that her parental rights to another child had been terminated less than one year before Chase's birth put him on notice that he needed to plan for Chase's care and be Chase's primary parent. Despite this knowledge, the father did not take steps to prepare for Chase's arrival. For example, he did not have stable housing or basic newborn supplies, such as a crib and car seat. The plan that the father did share with the department was "haphazard and insufficient" and left Chase "at imminent risk of serious abuse or neglect."

The judge also properly considered the father's lack of progress in completing the tasks on his action plans. See Adoption of Luc, 484 Mass. 139, 147 (2020). Although the father made some positive efforts, including attending visits with Chase before being detained in a house of correction, a number

of key tasks remained uncompleted at the time of trial, including participation in substance use assessment or treatment and domestic violence education.  The father testified that he signed up for parenting, anger management, and substance use classes but did not participate in them.

Moreover, the judge considered the father's criminal history in reaching the determination of unfitness.  See Care & Protection of Quinn, 54 Mass. App. Ct. 117, 125 (2002) (parent's criminal record is relevant to extent it bears on parental fitness).  At the time of trial, the father was being held "on dangerousness" on a thirteen-count indictment.  The judge also considered that the father had already served three jail sentences, each at least nine months long, by the time of Chase's birth, and that the father's involvement with law enforcement continued after Chase's birth.  This pattern continued "to place [Chase] at great risk of abuse or neglect due to Father's absence from [Chase's] life."  The judge also found that the father minimized his criminal history, "caus[ing] the Court greater concern for the danger Father would pose to [Chase] in that Father does not have the capacity to manage difficult times, and his reactions to them."

Taken together, the judge's findings provide clear and convincing evidence of the father's current and indefinite unfitness, and that the termination of his parental rights was

11

in Chase's best interests.  See Adoption of Yalena, 100 Mass. App. Ct. at 552-553.

3.  Adoption plan.  The father argues that the judge erred in terminating his parental rights without first choosing between the father's adoption plan and the department's plan, thereby leaving the choice of adoptive placement to the discretion of the department.  After finding a parent unfit, the judge is required to assess all placement plans and "determine which placement will serve the best interests of the child."  Adoption of Dora, 52 Mass. App. Ct. 472, 474-475 (2001).  The judge's assessment of each plan must be "even-handed," regardless of which party offered the plan (citation omitted).  Adoption of Irene, 54 Mass. App. Ct. 613, 617 (2022).  The judge's determination will not be reversed unless there is an abuse of discretion or clear error of law.  See Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub. nom. Hugo P. v. George P., 526 U.S. 1034 (1999).

The judge considered the department's plan that Chase be adopted by his current foster parents, who had already adopted Chase's maternal half-sibling and with whom Chase had lived "for nearly all his 8 months of life."  The judge considered Chase's "close connection" to his foster parents and that the placement is meeting Chase's needs.  Conversely, the judge considered the father's proposal that his sister, who lives in Vermont, adopt

12

Chase.  However, by the trial date, the department had not yet submitted a request for an ICPC home study due to delays in acquiring the required documents.[11]  The judge found that "[t]he longer that process takes, the stronger [Chase's] attachment to his current foster family will grow, making removal a potentially harmful act."  While the judge found the department's proposed adoption plan to be in the best interests of Chase, she acknowledged that the department's proposed plan could change depending on the results of an ICPC home study of the paternal aunt.  Consequently, the judge concluded that "[i]f the Department elects to place [Chase] with . . . his aunt, the Department shall file notice of such intention with the Court so that the amended plan can be considered, and counsel for [Chase] will have an opportunity to be heard."

"[W]here the judge lacks sufficient information to determine what plan serves the child's best interests, it is not appropriate for the judge 'to leave the choice of adoptive placement to the discretion of [the department] subject only to

_____

[11] To initiate an ICPC home study, which is required for potential out-of-State placements, the department needs the child's birth certificate and Social Security number.  The department requested Chase's birth certificate "immediately after his November 2023 birth and followed up on the request several times but did not receive it until March of 2024."  The department applied for Chase's Social Security number after receiving his birth certificate but had not received anything by the time of trial.

13

review by the adoption judge under G. L. c. 210, § 6.'" Adoption of Cadence, 81 Mass. App. Ct. 162, 171 (2012), quoting Adoption of Dora, 52 Mass. App. Ct. at 476. Here, the judge determined that the department's plan was in Chase's best interests, but because the results of an ICPC could alter the department's placement decision, the judge directed the department to file notice of any change with the court and reserved the authority to approve or deny the altered plan. This did not equate to an impermissible delegation of a judge's statutory duty to determine what is in the child's best interests.

Decree affirmed.

By the Court (Grant, Brennan & Smyth, JJ.[12]),

Paul Little

Clerk

Entered: December 18, 2025.

---

[12] The panelists are listed in order of seniority.