NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-593

ADOPTION OF FARHINA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial on a review and redetermination motion brought by the Department of Children and Families (department) pursuant to G. L. c. 119, § 26, a judge of the Juvenile Court terminated the father's parental rights to his child, Farhina.[2] On appeal, the father argues that the evidence did not clearly and convincingly establish that he is currently unfit or that he would remain unfit to parent his child in the indefinite future. He further contends that the judge misinterpreted the testimony of the father's expert regarding his parental fitness and erred in concluding that the department made reasonable efforts to reunite him with Farhina.  The father further argues that the

---

[1] A pseudonym.

[2] The mother's parental rights were also terminated, but she did not file a notice of appeal.

judge abused her discretion by concluding that the termination of his parental rights was in Farhina's best interests. Finally, the father contends that the judge's consideration of the Interstate Compact on the Placement of Children (ICPC or Interstate Compact) home study denial in evaluating the father's fitness violated his constitutional rights and amounted to an abuse of discretion.[3]  We affirm.

Background.  The mother and the father were involved in a romantic relationship for more than four years during which time the father was aware that the mother was using heroin daily and "crack" cocaine sporadically.  Farhina was born in New York on March 31, 2020, and had been exposed in utero to marijuana and methadone.  The mother struggled with long-term addiction and, at the time of Farhina's birth, was participating in a methadone treatment program.  On October 20, 2020, New York Child Protective Services (NYCPS) responded to a report that the mother and the father were not providing food or formula for Farhina.  During NYCPS's investigation, the mother admitted to

---

[3] At oral argument, appellate counsel for the father informed the court that he did not file the appellant's principal brief but had filed the reply brief.  Counsel represented that he was pressing the issues identified in the father's reply brief and not those included in the appellant's brief.  Accordingly, we do not expressly address arguments raised only in the appellant's brief, which in any event, were not persuasive and did not give us pause.

2

co-sleeping with Farhina and the father admitted to administering a urine test for substances on the mother without her knowledge and to putting a GPS tracker on the mother's car. In November, 2020, NYCPS removed Farhina from the mother's care and, after paternity was established, placed her with the father, allowing only supervised visitation with the mother.[4]

In July of 2021, the father brought Farhina to live temporarily with the mother as a family in Massachusetts while repairs were being made to the father's home in New York. In August 2021, the mother gave birth to another child in Massachusetts, and this infant tested positive for fentanyl, opiates, and cocaine. The infant remained at the hospital to obtain medication for the treatment of withdrawal symptoms while the mother left the hospital against medical advice. The mother acknowledged using fentanyl, cocaine, and heroin prior to that child's birth, and asked that the father be given custody of the child. The father declined to take custody of the infant, expressing skepticism that he was the father. And, while the father was later excluded as the biological father of the child by genetic marker testing, he admitted to still having intimate

---

[4] This placement was briefly suspended when Farhina was eight months old because the father had failed to sign her birth certificate. Once the father established his paternity, NYCPS closed the case and granted him full custody.

relations with the mother around the time of conception and was aware of the mother's substance use. The department filed a care and protection petition as to that child.

On October 15, 2021, the father attended a funeral in New York and left Farhina unsupervised with the mother in Massachusetts, even though he was aware that the New York order prohibited unsupervised contact with the mother, that Farhina and the newborn infant were born exposed to substances, and that the mother continued to struggle with a substance use disorder. While Farhina was left in the mother's care, police responded to a call from the mother's neighbor and found the nineteen month old Farhina alone in the apartment. When the father refused to cooperate with the department or even allow the department to view Farhina to check on her welfare, the department removed her and assumed custody under G. L. c. 119, § 51B.

The department was then granted emergency temporary custody of Farhina by the Juvenile Court pursuant to G. L. c. 209B, § 2 (a) (3) (ii).[5] The father subsequently returned to reside in New York in December of 2021. At the request of the department,

_____

[5] On October 18, 2021, Farhina had not lived in Massachusetts for the minimum required six consecutive months under the Massachusetts Child Custody Jurisdiction Act, G. L. c. 209B, § 1.

4

between March and June 2022, New York conducted an ICPC home study.  The mother, who was living with the father in New York, reported that she and the father were planning on getting married in 2022.  She further acknowledged that Farhina had been removed from the home because of her drug use.  The mother admitted to being eight weeks pregnant, and the father acknowledged that she continued to struggle with substance use.  The mother reported that the father does not allow her in the house when she is using drugs and that he administers a urine screen when he is suspicious that she is using drugs.  New York denied placement of Farhina with the father upon completion of the interstate home study due to concerns about the mother's substance abuse and the physical safety of the home.  Farhina was then placed by the department with her current foster parents in Massachusetts.

While Farhina's care and protection case was pending in the Juvenile Court, the mother gave birth to another child -- her second with the father -- in Philadelphia in September of 2022.  That child was born prematurely, weighing a little over two pounds, and tested positive for cocaine, heroin, and fentanyl.  The child was admitted to the hospital for an extended period to address his medical issues including his withdrawal from substances.  The mother left the hospital without the child and

5

provided the hospital with only the father's phone number to contact her.[6]  The judge did not credit the father's testimony that he was not in communication with the mother during this time, notably because the hospital would contact the father when trying to get in touch with the mother, and he would drive her to and from the hospital in Pennsylvania.  The judge also found the father was evasive in his testimony about his communication with the mother.

A termination of parental rights hearing occurred on January 12, 2023, pursuant to G. L. c. 119, § 26.  During these proceedings, the department had supported reunification and had provided the father with family action plans that included tasks for individual counseling, anger management, psychological evaluation, and parenting classes, all of which were available in New York.  The father failed to complete a psychological evaluation, stating he had no intention to do so, and did not attend any parenting classes outside of those originally mandated by NYCPS.  As noted above, when the department sought to consider placing Farhina with the father at his residence in New York through an ICPC agreement, New York denied the request.

---

[6] Again, the father was unwilling to sign the child's birth certificate, but later a genetic marker test confirmed paternity.

By the hearing date, the department had changed the goal from reunification to adoption.[7]

At the hearing in January 2023, the father admitted to leaving Farhina unsupervised with the mother but blamed the department for Farhina's removal. He testified that the drug tests he gave the mother prior to leaving for New York had been sufficient to protect Farhina and did not acknowledge that leaving her with the mother violated the NYCPS order or that his decision placed Farhina "at imminent risk of serious abuse or neglect." When asked about his engagement in the family action plan, the father admitted that he only attended mental health counseling at the department's request and did not have a "diagnosis, treatment plan, or goal."[8] He also acknowledged that, although he was seeking custody of his second child with the mother, he had not taken any action and was not cooperating with child protective services in Pennsylvania.

At the conclusion of the hearing, the judge found that the father was unfit to parent Farhina at the time, citing to the father's (1) limited insight on the impact of the mother's substance abuse on her parenting of Farhina, (2) inability to

_____

[7] Farhina supported the department in this goal.

[8] The father further testified that during counseling, they "just sit around and talk."

7

set safe boundaries with the mother, (3) limited engagement with department services to address his shortcomings, and (4) ongoing residence in New York with no supervision. However, the judge found that the department had not satisfied its burden to prove that the father's unfitness would likely continue into the future to a near certitude, noting that the father had begun some treatment and engaged in some services. As a result, the judge placed Farhina in the permanent custody of the department but did not terminate the father's parental rights.

A year later, in January 2024, the department filed a motion for review and redetermination under G. L. c. 119, § 26, once again seeking to terminate the father's parental rights. A trial took place over the course of three days in September and October of 2024, at which the father testified and introduced into evidence the testimony and report from Dr. Christopher Rose, who was qualified as an expert in clinical psychology. Dr. Rose's report was entered into evidence without objection and he also testified, opining that the father showed no signs of intellectual deficit, that he used an avoidant coping style to avoid sources of stress (a barrier, the judge found, to safe and stable parenting), and had a personality profile that indicated the father was not equipped to meet the demands of parenting Farhina. Dr. Rose also diagnosed the father with an

adjustment disorder with mixed anxiety and a depressed mood and found he had mixed personality traits that could cause distress or interfere with optimal functioning. He recommended that the father attend weekly counseling and explained to the father that participating in Al-Anon could help him interact with the mother. The father did not heed Dr. Rose's advice. The father testified that he was aware that the mother reported to Pennsylvania authorities that she was still using drugs and that the mother would frequently and inexplicably go back and forth to the car during their supervised visits with their second child in Philadelphia. While the father acknowledged the mother's drug use, he testified that he was not concerned that it had any impact on Farhina or any of her other children despite evidence to the contrary and he denied that the mother posed any risk to Farhina. He also refused to engage in Al-Anon or other counseling because he was "not involved with anyone with an addiction."

In her findings of fact and conclusions of law explaining the basis of her decision, the judge found that the "evidence at the initial trial and the review and redetermination trial overwhelmingly indicate that [the] [f]ather is unfit to parent Farhina." See Care & Protection of Erin, 443 Mass. 567, 570 (2005) ("In review and redetermination hearings, the judge . . .

9

builds on findings established in the preceding stages. The proper focus of inquiry . . . is on those facts that have undergone some metamorphosis since the previous order or are newly developed" [quotation and citation omitted]). Specifically, the judge found that the father's pattern of behavior had essentially not changed since the January 2023 hearing, nor was it likely to change in the future. The judge noted that the only things that had changed between the initial trial in January 2023 and the review and redetermination hearing in 2024 were the father's completion of a psychological evaluation and his continued engagement with the mother regarding their child in Pennsylvania. The judge further noted that since Farhina's removal, "the primary areas of danger" to her have been centered on the mother's continued substance abuse and "the ways in which that makes [the] [m]other unable to care for Farhina and [the] [f]ather's inability or unwillingness to acknowledge this danger and change his behavior regarding [the] [m]other." Furthermore, the judge found that the father continued to demonstrate an inability to grasp the risk posed to Farhina by the mother -- an understanding the judge found unlikely to change -- as well as an unwillingness to factor in the mother's ongoing struggle with drug abuse into his decision-making about Farhina.

Accordingly, the judge determined the father was still unfit, that his unfitness was likely to continue into the indefinite future, and as a result terminated the father's parental rights and approved the department's plan of adoption as being in the best interests of Farhina. Farhina was flourishing with the preadoptive family, who facilitated visits between Farhina and her sister, saw to her ophthalmological issues, and recognized and supported her relationship with the father. The judge also recognized the bond between the father and Farhina and ordered posttermination and postadoption contact with a minimum of two visits per year if the custodian determines it to still be in Farhina's best interests.

Discussion. 1. Reasonable efforts. For the first time on appeal, the father argues that the department failed to make reasonable efforts to reunify him and Farhina. Because the father did not raise this claim in the Juvenile Court, it is waived. Adoption of Yalena, 100 Mass. App. Ct. 542, 554 (2021). See Adoption of West, 97 Mass. App. Ct. 238, 242 (2020) ("[A] parent must raise a claim of inadequate services in a timely manner . . . either when the parenting plan is adopted, when [he] receives those services, or shortly thereafter" [quotation and citations omitted]). Counsel for the father argues that his reasonable efforts challenge was not waived because he filed a

11

letter pursuant to Mass. R. A. P. 16 (l), as appearing in 481 Mass. 1628 (2019), in which he corrected inaccurate legal citations in the father's appellate brief. This argument misses the mark, as the waiver did not stem from counsel's failure to provide correct legal citations before this court, but rather is due to the father's failure to raise the claim in a timely manner in the Juvenile Court.

However, even if the argument was somehow preserved, which it was not, we are not persuaded. The department "is required to make reasonable efforts to strengthen and encourage the integrity of the family before proceeding with an action designed to sever family ties." Adoption of Lenore, 55 Mass. App. Ct. 275, 278 (2002). "[H]eroic or extraordinary measures, however desirable they may at least abstractly be, are not required." Id. "A judge's determination that the department made reasonable efforts will not be reversed unless clearly erroneous." Adoption of West, 97 Mass. App. Ct. at 242.[9]

Here, the record supports the conclusion that the department made reasonable efforts to reunify Farhina with the father. The department provided an action plan to the family

---

[9] Even when a judge determines that the department has not made reasonable efforts, it should not "preclude the court from making any appropriate order conducive to the child's best interest." Adoption of Ilona, 459 Mass. 53, 61 (2011), quoting G. L. c. 199, § 29C.

12

upon removal of Farhina and then drafted seven additional action plans to guide and assist the father in addressing his parental shortcomings. While the father argues that the department's efforts were not reasonable because they failed to refer him to services in New York, there is no evidence that the father could not access the recommended services. In fact, the father's employment required him to travel between New York, Pennsylvania, and Massachusetts on a regular basis. Contrary to the father's claim that the department did not provide him with services that he could readily access, the undisputed facts show that the father refused to engage in most recommendations suggested by the action plans. His refusal to engage in services cannot be recast to a claim that the department somehow failed to make reasonable efforts to reunite him with Farhina. There was no error in the judge's finding that the department had made reasonable efforts.

2. The father's unfitness and the termination of his parental rights. "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit, and, if the parent is unfit, whether [Farhina]'s best interests will be served by terminating the legal relation between parent and child." Adoption of Patty, 489 Mass. 630, 637 (2022), quoting Adoption

13

of Ilona, 459 Mass. 53, 59 (2011).  "While a decision of unfitness must be supported by clear and convincing evidence, a judge's findings will be disturbed only if they are clearly erroneous" (citations omitted).  Adoption of Paula, 420 Mass. 716, 729 (1995).  "A finding is clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (quotation and citation omitted).  Adoption of Rhona, 57 Mass. App. Ct. 479, 482 (2003).  "We give substantial deference to the judge's findings of fact and [termination] decision, and will reverse only 'where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion.'"  Adoption of Luc, 484 Mass. 139, 144 (2020), quoting Adoption of Ilona, 459 Mass. at 59.

"Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for [Farhina]'s particular needs, affections, and age."  Adoption of Anton, 72 Mass. App. Ct. 667, 673 (2008).  In determining parental unfitness, a judge must decide both whether the parent is currently unfit and whether there is a reasonable likelihood that the parent's unfitness is likely to continue indefinitely into the future.  See Adoption of Lisette, 93 Mass. App. Ct.

14

284, 296 (2018). "[A] judge's conclusion that a parent's unfitness is temporary must rest on credible evidence supporting a reasonable likelihood that the parent will become fit, not on a 'faint hope.'" Adoption of Ilona, 459 Mass. at 59, quoting Adoption of Inez, 428 Mass. 717, 723 (1999). "Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period." Adoption of Ilona, supra at 60.

We conclude that the judge's ultimate findings that the father remained unfit and that his unfitness was likely to continue into the indefinite future were well supported by the record, and we also discern no error or abuse of discretion in the judge's conclusion that termination was in Farhina's best interests. The judge's initial determination that the father was unfit was based mainly on the father's failure to acknowledge, let alone address, the inherent risk of serious abuse or neglect to Farhina by allowing unsupervised contact with the mother. The judge's determination in 2024 that the father's unfitness was not temporary was based mainly on the undisputed evidence of the father's ongoing failure to acknowledge the risk that the mother posed to Farhina. After the department assumed custody of Farhina, the father continued to be involved in a relationship with the mother even though he

15

knew that the mother "has problems with not staying clean." Instead of addressing his own parental shortcomings, including following the department's recommended action plan to understand the risks associated with allowing the mother unsupervised contact with Farhina, the father refused to recognize the danger to Farhina and continued to prioritize his relationship with the mother over reducing the risk to Farhina. In fact, the father had another child with the mother, a child also born exposed to substances.

In concluding that the father was unfit, the judge appropriately considered the testimony of the father's own expert, Dr. Rose, who evaluated the father and testified about the father's avoidant coping style and his inability to manage stressful situations. The judge credited Dr. Rose's opinion that the father has average cognitive functioning and that he did not suffer any intellectual deficit that would grossly interfere with his ability to function and perform daily living tasks. Dr. Rose also found the father to be experiencing anxiety, depression, and an adjustment disorder and recommended that the father engage in long-term therapy. Dr. Rose described that the father uses an "avoidant coping style" to maintain emotional stability, and as such will go to great lengths to avoid the sources of stress. The father's expert advised him to

continue with outpatient therapy on a weekly basis, share the evaluation with his therapist, and participate in Al-Anon, but the father did not heed this advice. While the father completed an intake for therapy, he never actually engaged in any counseling to address the avoidant behavior that was directly related to his parental shortcomings.

Despite this undisputed evidence from the father's expert, the father argues that the judge abused her discretion by misconstruing Dr. Rose's testimony and report. We are not persuaded, as these arguments "amount to no more than a disagreement with the judge's weighing of the evidence and credibility determinations regarding witnesses." Adoption of Don, 435 Mass. 158, 166 (2001). In determining the father's ability to safely to parent Farhina, the judge properly considered that the father would go to great lengths to avoid stress, which in this case resulted in inherent risk and danger to Farhina by allowing unsupervised contact with the mother.

The father also contends that, because the father had made substantial progress in addressing his parental shortcomings, the judge erred in finding that his fitness was likely to continue into the indefinite future. Again, we disagree. "Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to

17

weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary." Adoption of Ilona, 459 Mass. at 59-60.  See Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019) (parent's failure to benefit from services is "relevant to the determination of unfitness" [citation omitted]).  Farhina's stability is an important consideration, and her best interests are not served by indefinitely waiting for the potential or hope that the father will address his parental shortcomings.  See Adoption of Nancy, 443 Mass. 512, 517 (2005).

The judge recognized that the father had completed a psychological evaluation, but, in the context of this case, the completion of an evaluation was not enough to establish that the father was making significant progress and certainly was not enough to reduce the risk of harm to Farhina.  In the almost three-year span since Farhina had been removed from the father's custody, the father had yet to acknowledge or address the main issue identified in the 2023 hearing -- the risk of allowing the mother to have unsupervised contact with Farhina.  The father ignored most of the department's recommendations in the action plan as well as those of his own expert.  While the father claims that the judge erred because "nothing changed" to justify termination of his parental rights, the fact that nothing

18

changed is exactly the reason why the judge determined that the father's unfitness was likely to continue into the indefinite future. The undisputed facts support the judge's determination that the father was unfit and the termination decision.

3. Interstate Compact. The father's final argument is that in determining parental fitness, the judge improperly considered the ICPC denial of his New York home plan and the father's failure to relocate to Massachusetts once he learned of its denial. Though the ICPC statute provides a floor of protection, not a ceiling, "[the department] has promulgated regulations that require there to be an ICPC agreement in place even in some situations where the statute itself does not do so." Adoption of Knox, 102 Mass. App. Ct. 84, 89 (2023). This includes the requirement of ICPC compliance for "any stay across state borders whenever the sending agency requests a home study or supervision of a child by the receiving state." Id., quoting 110 Code Mass. Regs. § 7.503(8) (2008). "This regulation has the force of law, and is presumptively valid and must be accorded with all the deference due to a statute" (quotations and citation omitted). Adoption of Knox, supra. The father does not challenge the department's regulation as ultra vires.[10]

---

[10] To the extent that the father argues that the department's regulation infringes on the father's constitutional right to travel, we are not persuaded. "[A]pplication of the

19

The judge found that by the end of the first trial in 2023, the father was aware of the identified risks that supported a finding of unfitness, including that the ICPC home plan denial was a barrier to placing Farhina in his custody. Given the history of the father's continued relationship with the mother despite her ongoing substance abuse and the fact that she gave birth to several babies exposed to substances, the judge had told the father that if she were to consider granting custody of Farhina to him and sending Farhina to New York, it would have to be supervised. Finally, it was explained to the father that if he resided in New York and the updated ICPC request was denied, he would not be granted custody.

The ICPC plan was denied and, despite his acknowledgment that he was considering moving to Massachusetts, the father never did. The judge found this "to be an example of [the] [f]ather's patterned response to information or feedback that he does not want to hear. He ignores it. [The] [f]ather's avoidance of supervision or scrutiny prevented the possibility

_____

ICPC to parents who have moved out of State does not discriminate against such parents; instead, it merely seeks to ensure that they will receive the same supports and oversight that would be in place had they remained in the Commonwealth." Adoption of Knox, 102 Mass. App. Ct. at 90 n. 9.

that [Farhina] might be placed with him.  He chose his own comfort over [Farhina]."

The father's argument that the judge improperly considered this evidence lacks merit, as the undisputed facts establish that, prior to moving to Massachusetts, Farhina had been placed in the custody of child protective services in New York due to the mother's substance use.  It is also undisputed that the father failed to protect Farhina when he left her with the mother and returned to New York, in violation of the conditions of custody imposed by New York and resulting in Farhina's being left unattended in the mother's apartment.  In considering whether Farhina should be placed with the father, the judge correctly noted that it would require the supervision of the New York authorities, which in turn required an approved ICPC.  In determining his ability to care for Farhina, the judge did not err in considering the ICPC home study or the father's failure

to make the necessary changes to provide a safe and suitable home for Farhina.

Decree affirmed.

By the Court (Rubin, Walsh & Hershfang, JJ.[11]),

Clerk

Entered: January 29, 2026.

---

[11] The panelists are listed in order of seniority.